**Donna PARRISH, Plaintiff,**

**v.**

**Louis SOLLECITO, Individually, James Gallagher, Individually, Mount Kisco Import Cars, Ltd. d/b/a Mount Kisco Honda, and Westchester Import Cars, Ltd, d/b/a/ Acura of Bedford Hills, Defendants.**

**No. 01 CIV. 5420.**

United States District Court, S.D. New York.

March 14, 2003.

---

---

### CORRECTED AMENDED DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Donna Parrish ("Parrish") brought this action alleging sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and corresponding provisions of the New York State Human Rights Law. Defendants comprise Parrish's former employers and supervisor (collectively "Defendants"), whose alleged misconduct gave rise to this action. Before the Court is Defendants' motion for summary judgment. At a conference on the record on December 20, 2002, the Court announced its decision to deny the motion and outlined the grounds for its ruling. A full elaboration of the Court's findings, conclusions and reasoning is set forth below.

### I. FACTS

Parrish was hired by defendant Louis Sollecito ("Sollecito") to work, commencing on February 26, 2000, as a finance and income ("F & I") manager for Acura of Bedford Hills ("Acura") and Mount Kisco Honda ("Honda"), two automobile dealerships owned by Sollecito and located in Westchester County approximately one quarter mile apart. In that capacity, Parrish's job entailed arranging for credit financing and after-sale optional features for customers who bought cars from Acura and Honda. Upon completion of a purchase, the salesperson would deliver the transaction documents to Parrish's office. She would then contact the customer, attempt to sell optional products, such as extended warranties, and arrange for delivery of the vehicle.

At various times from 1985 to 1998, Parrish had performed similar work at Sollecito's various dealerships in Connecticut and Westchester, including at Acura in 1993 and Honda in 1998, prior to relocating to Florida that year.

During Parrish's employment in 2000 and 2001, defendant James Gallagher ("Gallagher") was the General Manager of Acura, a position he had held since 1997, working without an F & I manager until Parrish was hired in 2000. During that same period, Thomas Murray ("Murray") was the General Manager of Honda. Parrish's office was located at Honda. At the time Parrish began working at Acura and Honda in February 2000, Parrish and Murray were living together in Connecticut. They were married in December 2000.

The instant action is grounded on certain charges of misconduct Parrish asserts against Gallagher that she claims constitute unlawful sexual harassment and on Defendants' alleged acts of retaliation against Parrish for protesting Gallagher's behavior. Specifically, Parrish describes four occasions on which she alleges Gallagher touched her in an offensive, unwanted manner.

### 1. *The March 6, 2000 Incident*

According to Parrish, Gallagher's first act of harassment occurred on March 6, 2000 (the "March 6 Incident"), one week after she commenced her job. This incident occurred at a meeting in Murray's office at Honda that was scheduled by Murray to introduce Parrish to Gallagher and to discuss her assignment to work for both dealerships. Present in addition to Parrish, Murray and Gallagher was John Tutino ("Tutino"), who worked at Honda as a Sales Manager. At the time of the incident, Murray was sitting behind his desk while Parrish and Gallagher sat in adjacent chairs in front of Murray. Tutino was seated to the side of Murray's desk.

Parrish alleges that at some point during the discussion Gallagher placed his hand on her leg above her knee, and then slid it under her skirt and rubbed up and down her thighs, reaching close to her groin, and that she responded by moving to the other side of the chair. Tutino testified at his deposition that he saw Gallagher touch Parrish's leg above the knee for a "slight second". Murray testified that he did not see Gallagher place his hand on Parrish's leg.

After the meeting, Parrish, in Tutino's presence, reported the touching to Murray, who claims he then contacted James McGrath, an attorney for the Greater New York Dealers Association (the "GNY") to seek his advice. By Murray's account, McGrath suggested that Murray should inform Sollecito and ask a female manager to record what occurred. Murray then requested that Lori Rowe ("Rowe"), Honda's Office Manager, make a note of the incident.[1] Rowe made an entry in her office daily calendar, which Parrish re-viewed, jotting down Parrish's report of Gallagher's having touched her leg.

Parrish alleges that she contacted Sollecito shortly after the March 6 Incident and that Sollecito told her, seemingly making light of the matter, to report to him if it happened again and that Sollecito "would break his fingers if he touches you like that." (Deposition of Donna Parrish, attached as Exhibit A to the Affirmation of Joshua Marcus, dated July 31, 2002, at 94.) Sollecito, however, denies having had any conversation with Parrish at that time and testified that Parrish's complaints about Gallagher did not come to his attention until he received the sexual discrimination charge Parrish filed with the Equal Employment Opportunity Commission ("EEOC") in April 2001.

### 2. *The March 9, 2000 Incident*

Parrish's second reported incident of harassment allegedly occurred three days later, on March 9, 2000 (the "March 9 Incident"), at a meeting in Murray's office. The same persons were present and sat in a similar arrangement, Murray behind his desk, Parrish and Gallagher facing him and Tutino to the side. According to Parrish, Gallagher again reached over, placed his hand under Parrish's skirt and stroked her thigh up to the proximity of her groin. Murray testified that this time he observed Gallagher reaching towards Parrish and touching her leg above the knee but that he could not tell how far along Parrish's thigh Gallagher's hand may have travelled. In Parrish's version of the episode, after the meeting, Tutino allegedly said "he did it again." Tutino's testimony makes no mention of the second incident. Rowe, however, allegedly recorded the oc-

---

1. There is some dispute and ambiguity as to the timing and number of Rowe's calendar entries of the incidents in question. For the purposes of this motion, the Court resolves any doubt or ambiguity in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

currence in her office planner for that day and showed her notation to Parrish. The entry stated that Gallagher had placed his hand on Parrish's leg above the knee.

### 3. *The March 15, 2000 Incident*

In Parrish's third charge of harassment, she claims that Gallagher touched her again on March 15, 2000 (the "March 15 Incident") at a meeting in Murray's office attended by the same cast seated in the same order and allegedly following the same pattern as the two previous occasions. Murray testified that he again witnessed Gallagher place his hand on Parrish's thigh but could not see how far it travelled. Rowe was requested again to record Parrish's report of the incident and did so in her daily planner, adding a notation that Murray had contacted the "GNY".

### 4. *The July 2000 Incident*

Parrish claims that Gallagher touched her again in a similar manner in July 2000. The incident allegedly occurred at a reception in a restaurant following a funeral service for Sollecito's father. According to Parrish, Gallagher sat next to her at a table and placed his hand under her dress, stroking her leg close to her groin, and that she immediately stood up and left. Parrish claims that she called Sollecito soon after the July occurrence and sought to complain about it, but that Sollecito changed the subject and finally stated that he would speak to Gallagher, but that he never did. Parrish did not ask Rowe to record this incident, allegedly because it happened outside the dealership offices.

Parrish asserts that in addition to these four acts of unwanted touching, on numerous occasions in September 2000 and later, Gallagher entered her office, peered down her blouse and moved his face in close proximity to hers, making her feel uncom-

fortable. She also maintains that soon after she complained to Sollecito following the March 6 Incident, Gallagher instructed his sales staff at Acura not to deal with Parrish, that the salespersons refused to cooperate with her, failed to provide her the paperwork necessary for her to do her follow-up work on sales, and sought to go around her, so as to deal directly with the customers and deprive her of commissions.

Parrish asserts that she learned in April 2001 that Sollecito and Gallagher, without informing her, had decided to terminate her employment at Acura. She then filed a charge with the EEOC alleging sexual harassment and retaliation. Defendants contend that Gallagher was dissatisfied with Parrish's performance because she favored Honda sales staff over Acura's on account of her relationship with Murray. In fact, Parrish was discharged from Acura in early April 2001, which she asserts caused her to lose approximately half of her income. On June 25, 2001, both Parrish and Murray resigned from their positions at Honda, claiming that they were forced to do so on account of the alleged hostile work environment at Honda.

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

A motion for summary judgment may be granted only if the court determines on the record before it that there is no genuine issue of material fact to be tried and that the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68 (2d Cir.2000). The burden of showing that no factual dispute exists rests with the party seeking summary judgment. *See Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In examining the

evidence on the record to assess whether a genuine issue of material fact exists, the court must resolve doubts and ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Anderson,* 477 U.S. at 242, 106 S.Ct. 2505. The Court's role is to determine whether there are issues of fact that require a trial, and not to resolve such disputed matters. *See Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). If the record contains concrete evidence from which a rational trier of fact could render a reasonable verdict in favor of the non-moving party, summary judgment is improper. *See Anderson,* 477 U.S. at 248, 256, 106 S.Ct. 2505.

## B. *HOSTILE WORK ENVIRONMENT*

Parrish's first claim proceeds on a theory of sexual discrimination based on Defendants' having created a hostile or abusive working environment. She contends that the various instances of misconduct by Gallagher recounted above were unwanted, inappropriate and sufficiently severe or pervasive to alter the conditions of her employment and thus constituted actionable sexual harassment.

Defendants counter that only one of the four acts of discrimination Parrish alleges occurred within 300 days of her filing an EEOC complaint, and that the remaining act, which occurred outside the dealerships, was not work-related and thus did not affect Parrish's work environment.

Defendants also claim that even if considered together, the four incidents do not suffice to establish a hostile work environment because they were not sufficiently pervasive, severe or physically threatening. In support, Defendants cite several cases involving claims of a hostile work environment in which the harassing supervisor or co-worker engaged in touching or suggestive comments, or other conduct that the plaintiff considered offensive, but that were dismissed by the courts as insufficient. *See, e.g., Saxton v. AT & T Co.,* 10 F.3d 526 (7th Cir.1993); *Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993); *Shepherd v. Comptroller of Pub. Accts. of Texas,* 168 F.3d 871 (5th Cir. 1999); *Lucas v. South Nassau Communities Hosp.,* 54 F.Supp.2d 141 (E.D.N.Y. 1998); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 298–99 (S.D.N.Y. 1987).

### 1. *Severity*

In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court enunciated the standard governing determinations of sexual harassment claims. The Court declared that: "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Additional guidance further elaborating on this doctrine was provided in *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). There, the Supreme Court declared that in a Title VII hostile environment claim, plaintiff must establish that (1) the "workplace is permeated with discriminatory intimidation, ridicule and insult" that is sufficiently "severe or pervasive" to create an " 'objectively' hostile or abusive work environment", and (2) that in fact she "subjectively perceive[d] the environment to be abusive." *Id.* at 21–22, 114 S.Ct. 367.

To aid the determination of whether particular workplace misconduct is sufficiently "severe or pervasive," the *Harris* Court articulated a list of several nonexclusive considerations: whether, in the light of all the circumstances, the discrimi-

natory behavior (1) was sufficiently frequent, or (2) severe; (3) was physically threatening or humiliating or merely an offensive comment; (4) unreasonably interfered with the victim's work; and (5) caused psychological harm. *See id.* at 23, 114 S.Ct. 367. By way of contrast, the Supreme Court instructed that " 'simple teasing' . . . offhand comments; and isolated incidents (unless extremely serious)" will not suffice to satisfy this standard. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); *see also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767–68 (2d Cir.1998); *Carrero v. NYC Hous. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989); *cf. Richardson v. NYS Dep't Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999) (defining similar standards with respect to racial harassment).

■■■ The Second Circuit has enunciated other pertinent rules that further prescribe the proper scope of the frequency and severity for alleged discriminatory conduct that must be shown to be actionable under a hostile work environment theory. "Isolated incidents or episodic conduct will not support a hostile work environment claim." *Richardson,* 180 F.3d at 437. If an alleged act of harassment is merely offensive, so that it does not unreasonably interfere with the employee's job performance, and is not " 'sufficiently continuous and concerted' to be considered pervasive, it is beyond the purview of the discrimination laws." *Brennan v. Metropolitan Opera Assn.,* 192 F.3d 310, 318 (2d Cir.1999) (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)).

■■■ Nonetheless, even if minor incidents do not merit relief under Title VII, "even a single episode of harassment, *if severe enough,* can establish a hostile

work environment." *Torres v. Pisano,* 116 F.3d 625, 631 n. 4 (2d Cir.1997), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997) (emphasis added); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment. . .") Moreover, the Circuit Court has noted that the applicable standards "caution[ ] to consider the totality of the circumstances . . . and to evaluate the 'quantity, frequency, and severity' of the incidents . . . . [T]he factors must be considered 'cumulatively,' so that we may 'obtain a realistic view of the work environment.' " *Richardson,* 180 F.3d at 437 (internal citations omitted). Finally, a charge of sexual harassment in a hostile work environment action poses a mixed question of law and fact, which is " 'especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue.' " *Id.* (quoting *Mendell v. Greenberg,* 927 F.2d 667, 673 (2d Cir. 1990)).

In the cases Defendants rely upon, though the challenged conduct was held not actionable, even if inappropriate or offensive, the circumstances are easily distinguishable from those at issue here. The incidents described in those cases were only episodic, or the physical touchings not sufficiently severe, or the employer manifested unequivocally that it considered the charge a serious matter and took prompt remedial steps to address it, or presented sufficient, nondiscriminatory reasons to support the underlying adverse employment action that the plaintiff contested. *See, e.g., Shepherd,* 168 F.3d at 873; *Saxton,* 10 F.3d at 535; *Weiss,* 990 F.2d at 336; *see also Kauffman v. Allied Signal,*

*Inc., Autolite Division,* 970 F.2d 178, 184–85 (6th Cir.1992).

Defendants seek to trivialize Parrish's charges by characterizing Gallagher's alleged harassment as falling within the category of conduct deemed relatively minor, sporadic or merely offensive behavior. The Court is not persuaded. Here a genuine factual dispute exists concerning the severity of Gallagher's sexual transgressions. Parrish alleges that on each of four separate occasions Gallagher touched and rubbed her leg under her skirt, well above the knee and approaching her groin. Such bodily contact, if proven, cannot be equated in manner or degree with the isolated rubbing of an arm or shoulder alleged in some of the cases Defendants cite.

At the root of sexual harassment claims is discrimination "because of sex." *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998. Under some circumstances, a person's touching another on the shoulder or rubbing an arm may be ambiguous and may be misunderstood as regards any sexual motivation. And situations may arise in which reasonable people may differ as to whether or not such a touching, even if sexually driven, was objectively offensive or severe. But what Parrish asserts here leaves little room for doubt or mistake that Gallagher's touchings comprised "physical conduct of a sexual nature." *Meritor,* 477 U.S. at 65. A man's hand crawling under a woman's skirt and creeping toward her groin, not once, but on four separate occasions, cannot reasonably be considered as anything but "because of sex." *See Rene v. MGM Grand Hotel, Inc.,* 305 F.3d 1061, 1066 (9th Cir.2002) ("Such harassment—grabbing, poking, rubbing or mouthing areas of the body linked to sexuality—is inescapably 'because of … sex' ") (citing *Doe v. City of Belleville,* 119 F.3d 563, 580 (7th Cir.1997), *vacated and remanded by* — U.S. —, 123 S.Ct. 1573, 155 L.Ed.2d 313 (1998)).

Moreover, a supervisor's repeated, unwanted invasions near the private parts of a subordinate cannot be lightly dismissed as mere discourtesy or rudeness or insensitivity, nor should the repugnance the violation engenders be trivialized as meriting nothing more than passing annoyance and indignation. In this Court's assessment, reasonable factfinders would regard such extensive physical intrusions committed by a supervisor against an employee not as minor or ambiguous infractions, but rather would recognize them for what they are: brutish assaults that cannot help materially altering the employment relationship and creating an intolerable or intimidating work environment.

Defendants suggest that Parrish's evidence does not clearly establish that Gallagher's alleged touchings occurred above her knee and, injecting a point instinct with insinuation and accusation, they note that despite the prior incidents she sat next to Gallagher on each of the later occasions, and did not stand up and move away or immediately complain to Murray during the meeting itself. These challenges address matters of credibility and weight of the evidence, and not the sufficiency to create a genuine factual dispute concerning a material issue. Parrish's charge may or may not be plausible, and may or may not be believed. But, insofar as any ambiguity exists with respect to Gallagher's alleged conduct, and reasonable people may reach different conclusions in reconciling doubt with reality on this score, it is not the Court's function, but that of the jury, to decide whose account of the facts better accords with the truth. At this stage of the proceedings, the Court is required to resolve doubts and draw reasonable factual inferences in

favor of the non-movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Assuming Parrish's account is supported at trial and credited; a rational jury could reasonably find Gallagher's acts were serious enough to cross the threshold into unlawful behavior. The Court is confident that in the law's annals of sexual outrage, offenses much less egregious than those depicted here have passed muster as extreme enough to at least raise a material issue of fact warranting a trial. Thus, the Court cannot endorse Defendants' view and rule as a matter of law that such misconduct could not be actionable because the incidents occurred only episodically over a period of about twelve months and that Gallagher's sexual invasions of Parrish's body here alleged were therefore not sufficiently severe. A similar contention was "emphatically" rejected by the Second Circuit:

> [a] female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII. It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive. A complaining employee is required to prove that such conduct was unwelcome, that the conduct was prompted simply because of the employee's gender, and that the conduct was sufficiently pervasive to create an offensive environment antithetical to the priority of merit—not sex or some other prohibited criterion—in the work place.

*Carrero,* 890 F.2d at 578 (citing *Meritor,* 477 U.S. at 68, 106 S.Ct. 2399). On the record before it, the Court is persuaded that Parrish has established a *prima facie* case of hostile work environment sufficient to permit the case to proceed to determination by a jury.

### 2. *Statute of Limitations*

■ Defendants also argue that of the four instances of sexual harassment Parrish asserts, only the one in July 2000 occurred within the 300–day period prior to her filing a charge with the EEOC in April of 2001. They contend that this conduct should not be considered in the determination of whether sexual harassment occurred here because the incident allegedly happened outside the workplace, at a restaurant reception following the funeral service for Sollecito's father. Furthermore, Defendants assert that, standing alone, this act would represent nothing more than an isolated episode not sufficient to qualify as pervasive or severe enough to create a hostile work environment. In support of their arguments Defendants cite the rule articulated in some cases that: " 'as a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees.' " *Feliciano v. Alpha Sector, Inc.,* No. 00 Civ. 9309 (AGS), 2002 WL 1492139, *8 (S.D.N.Y. July 12, 2002) (quoting *P. v. Delta Air Lines, Inc.,* 102 F.Supp.2d 132, 138 (E.D.N.Y.2000)). Whatever the validity of this general doctrine so far as it goes, the Court does not agree that it has any application to the matter at hand.

■ The court is aware of no settled law that, in gauging the severity or pervasiveness and effects of sexual harassment, allows the offender to compartmentalize his misconduct, and to automatically discount or ignore certain self-selected instances within a repeated pattern of unwanted touchings and strokings he inflicts on a co-worker—in other words, to allow a harasser to pick and choose the venue for his

assaults so as to not account for those that occur physically outside the workplace. The employment relationship cannot be so finely and facilely parsed. It comprises multiple dimensions of time and place that cannot be mechanically confined within the precise clockwork and four walls of the office. The proper focus of sexual harassment jurisprudence is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it, on whether the employer has created a hostile or abusive "work environment," or a "workplace" where sexual offenses occur and are sufficiently severe or pervasive to alter the victim's terms and conditions of employment wherever the employment relationship reasonably carries. *See Meritor*, 477 U.S. at 67, 106 S.Ct. 2399; *Harris*, 510 U.S. at 22, 114 S.Ct. 367; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Defendants' theory thus raises a fundamental inquiry: Just how far does the "workplace" extend, and when and where may be found the spacial and temporal continuum of the "work environment" encompassed within the scope of discrimination Title VII proscribes?

In addressing this issue, the Court notes at the outset that as a practical matter an employment relationship and the employee's corresponding status, while generally commencing and grounded in what constitutes the office or plant, often carries beyond the work station's physical bounds and regular hours. Thus, the working environment that characterizes the enterprise's home base—the governing rules and their enforcement, the prevailing attitudes and perceptions of what is expected, forbidden or condoned by the employer as defined workplace behavior—may project its effects outside, thereby setting the tone for how the employees comport themselves towards one another elsewhere.

In fact, employees travel and transact business while "on the road" or "in the field." They may also interact outside the office at business-related meals and social events. And they may encounter one another in external contexts not strictly stemming from or compelled by a business purpose, but to which the employment relationship may necessarily carry over by reason of circumstances that may have their origins in the workplace itself. *See, e.g., Burlington*, 524 U.S. 742, 748, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (drinks with the supervisor in the hotel lounge during a business trip); *Meritor*, 477 U.S. at 60, 106 S.Ct. 2399 (sexual relations with the supervisor at motels and restaurants after regular hours); *Tomka*, 66 F.3d at 1301–02 (dinner at the hotel with supervisors during a business trip); *Saxton*, 10 F.3d at 528 (lunch with the supervisor and drinks at a nightclub after work).

Thus, as in *Burlington*, the intimidation or unwelcome sexual advance the harasser initiates at the office may be consummated later in a hotel. Consequently, the precise geographic locus of the offending act should not distract from the real focus of the misconduct: the degree to which, wherever a sexual assault occurs, its consequences may be felt in the victim's "workplace" or "work environment" and be brought to bear on her terms and conditions of employment. Accordingly, the reach of the employment "environment" should be viewed holistically. A supervisor's unwanted sexual abuse that takes place outside the confines of the physical plant, but that reflects similar behavior to that which also occurred and was tolerated or not effectively remedied in the actual workplace, should amount to a virtual extension of the working environment to encompass the later act no less so than if the offense had been committed within the walls of the enterprise. This practical or

constructive extension of the work environment occurs because the offender's license to engage in sexual misconduct towards a co-worker outside the company may derive and draw comfort from his understanding of what is permissible behavior in the workplace or his perception of how far he can push the limits and what discriminatory wrongs against a fellow employee he can inflict with impunity.

More to the point, often such outside misbehavior rebounds and transposes its consequences inside the actual workplace itself. However much the transgressor chooses to minimize or dismiss an act of harassment because it allegedly happened beyond the workplace, the victim may not have the equal aplomb to leave the matter behind, to simply park her wrong and hurt outside the office. Rather, the centripetal bond that pulls the co-workers' lives around the same work orbit remains what it is wherever their common employment relation may proximately extend. In this light, the effects of an offensive sexual encounter that occurs outside the office may continue to manifest internally, within the actual working environment, and reflect in the terms and conditions of employment that the victim may have to cope with day-by-day: the ability to perform work duties satisfactorily under the stress of the episode; the mortification aroused by encountering the offender on the job on a regular basis; enduring constant apprehension as to whether the aggressor's misconduct may recur at any moment, or whether the employee's response, or lack of it, ultimately will transform into a material alteration of the job: demotion, denial of promotion, even dismissal. In short, for the victim, the unwanted external sexual incident may still pose the choice whether to tolerate the indignity of the supervisor's sexual abuse and vulgarity as a necessary condition of being allowed to earn a living.

Weighing these observations in the light of the totality of the circumstances evidenced here, several considerations compel a finding that the July Incident Parrish claims as sexual harassment should not be viewed in isolation from Gallagher's previous conduct. First, Parrish's attendance at the funeral reception for her employer's father cannot be deemed an entirely non-work-related, off-duty event. The service arose uniquely in the context of Parrish's employment relationship. It comprised an aspect of the ordinary and necessary social obligations and unstated expectations that are common adjuncts of various events and interactions associated with the normal course of business. In other words, the crossing of Parrish's and Gallagher's paths at the reception after the funeral did not arise purely out of social happenstance or a chance encounter. Nor can it be entirely disassociated from their mutual ties to Sollecito and the sense certain social situations ordinarily engender in employees—whether out of fear of the supervisor, respect for the employer, or interest in protecting the job or advancing within the company—that attendance at particular social functions outside the office or after hours, while not necessarily mandatory, nonetheless may be customary and beneficial to safeguard the employment relationship and enhance the employee's standing in the workplace. In sum, in all likelihood, Parrish and Gallagher both turned up at the same place propelled by some mixture of shared motivations, connections and social duties all ultimately tracing back to their employment relationship with Sollecito and Acura.

Second, the incident involved conduct by a manager who served as Parrish's immediate supervisor, rather than just another fellow worker, a consideration that eases the standard for imposition of vicarious liability on an employer for sexual harassment. *See Burlington,* 524 U.S. at 764–65,

118 S.Ct. 2257. Third, Gallagher's alleged harassment at the July reception was preceded by three other instances of misbehavior Parrish charges occurred in the workplace itself reflecting similar severity. Fourth, unlike the employers in other cases where the hostile environment claim was not sustained, *see, e.g., Saxton,* 10 F.3d at 535; *Kauffman,* 970 F.2d at 184–85, here, if Parrish's version of the facts is credited, Defendants not only took no meaningful remedial action upon Sollecito's being informed about Gallagher's first instance of harassment, but Sollecito himself apparently made light of the complaint and turned a deaf ear on Parrish's effort to raise the issue again following the July Incident. Consequently, a rational jury could reasonably infer that, had Sollecito taken effective remedial action in March after the first incident, and that, conceivably, had Gallagher not drawn comfort and encouragement from a sense that his conduct was permissible under the prevailing ethic of the workplace at Acura and thus could be repeated with impunity elsewhere, it is possible that the July Incident might not have occurred.

█ Because Parrish's claim is grounded on a hostile work environment theory, in determining whether the alleged conduct may be sufficiently severe or pervasive to constitute an unlawful employment practice actionable under Title VII, the Court may consider acts that occurred more than 300 days of the victim's filing of EEOC charge, as long one act contributing to the claim occurs within the filing period. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2074–75, 153 L.Ed.2d 106 (2002). In *Morgan,* the Supreme Court explicitly addressed this question, and provided guidance controlling here. It stated that:

[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.' ... The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 2074.

Under the circumstances presented here, the Court concludes that, cumulatively and in full context, the evidence on the record is sufficient to persuade a rational jury that Gallagher's conduct was severe or pervasive enough to create a hostile work environment for Parrish and thus to alter the terms and conditions of her employment. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *Carrero,* 890 F.2d at 577–78.

## C. *RETALIATION*

Parrish claims she was harassed and ultimately discharged from Acura in retaliation for her alleged complaints to Sollecito after the March and July Incidents concerning Gallagher's sexually inappropriate conduct.

█ To prevail on a claim of retaliation under Title VII, a plaintiff must provide sufficient evidence to establish a *prima facie* case comprised of the following elements: (1) participation in a protected activity; (2) knowledge by the employer of the employee's protected activity; (3) adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See Wimmer v. Suffolk County Police Dept.,*

176 F.3d 125, 134 (2d Cir.1999); *Quinn,* 159 F.3d at 769. Where the evidence of the alleged unlawful discrimination is only circumstantial, the sufficiency of a Title VII retaliation claim is assessed under the three-step burden-shifting inquiry enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Quinn,* 159 F.3d at 768–69 ("[T]he plaintiff must make out a *prima facie* case of retaliation.... [T]he defendant then has the burden of articulating a legitimate non-retaliatory reason for the complained of action.... [I]f the defendant meets its burden, plaintiff must adduce evidence 'sufficient to raise a fact issue as to whether [the employer's] reason was merely a pretext' for retaliation.") (quoting *Tomka,* 66 F.3d at 1309).

Here, the Court finds genuine issues in dispute with regard to the second and fourth elements of Parrish's *prima facie* case. There is also a material factual difference as to whether the grounds articulated by Defendants to justify Parrish's discharge were the real reasons for the action or a pretext for unlawful discrimination.

Defendants contend that Parrish fails to state a claim of retaliation because there is insufficient evidence that Sollecito was aware of Parrish's alleged complaints of harassment by Gallagher, and because Parrish has failed to establish the requisite causal connection between Parrish's alleged complaint to Sollecito in March 2000 and her termination in April 2001. They argue that to establish sufficient causation, the temporal proximity of the protected activity and the adverse employment action must be very close, and that applicable case law has held uniformly that a delay of thirteen months, such as that at

issue here, is too remote. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Gross v. National Broadcasting Co., Inc.,* 232 F.Supp.2d 58, 73 (S.D.N.Y. 2002); *Cooper v. Morgenthau,* No. 99 Civ. 11946 (WHP), 2001 WL 868003, *8 (S.D.N.Y. July 31, 2001). Defendants' argument fails for two reasons.

### 1. *Defendants' Knowledge*

The Court finds a genuine factual dispute as to whether Parrish reported the March and July 2000 Incidents to Sollecito. Parrish alleges that she informed Sollecito about Gallagher's conduct after the March Incident and that he treated the matter jokingly. She also claims that she endeavored to complain after the July Incident and that Sollecito refused to listen and changed the subject. Sollecito, on the other hand, flatly denies knowing anything about Parrish's allegation until he was served with her EEOC charge in 2001. The discrepancy in these two accounts as to a material issue represents a factual difference that the Court cannot resolve at this stage, but must be submitted to the trier of fact.

### 2. *Causal Connection*

There are also material contradictions in the parties' accounts regarding whether Gallagher took adverse employment actions after Parish's alleged complaint to Sollecito in March 2000, allegedly causing Acura salespeople under his supervision to make conditions of her employment more difficult. Parrish claims that Gallagher instructed his sales staff not to deal with Parrish and that they actively sought to deprive her of commissions by contacting customers directly to arrange the after-sales services ordinarily performed by Parrish. Insofar as such actions would work to materially diminish

Parrish's job duties and lower her income and opportunities for advancement within the company, they would constitute sufficient adverse employment actions. *See Burlington,* 524 U.S. at 761, 118 ·S.Ct. 2257.

Defendants, on the other hand, contend that the Acura sales staff were unhappy with Parrish's performance because she favored Honda and that they conveyed their dissatisfaction to Gallagher. These varying accounts raise material factual disputes as to whether, as Parrish contends, Defendants took other adverse employment actions more proximate to her alleged protest of Gallagher's harassment and closer to the date of Parrish's EEOC filing.

### 3. *Pretext*

██ Defendants argue that even if Parrish could state a *prima facie* claim of sexual harassment or retaliation, they have articulated valid business reasons for terminating her employment for poor performance and possible misconduct, including not being on the job when she was supposed to be. They also maintain that for legitimate business reasons they wanted a separate F & I Manager at Acura. Parrish challenges these reasons as pretextual. The Court finds genuine issues of fact as to the reasons for Defendants' dismissal of Parrish from Acura in April 2001.

According to Parrish, she complained to Sollecito in March 2000 after Gallagher's first instance of sexual harassment and again after the fourth incident in July 2000. She asserts that the Acura salespersons became uncooperative soon after her first complaint and subsequently made it difficult for her to perform her job duties. Parrish also argues that having a single F & I manager for two dealerships is not unusual, that Gallagher had functioned without a separate Acura F & I manager

during his entire tenure as General Manager prior to her arrival, and that the two locations here were only five minutes apart and required Acura employees to travel regularly to Honda in any event to review sales transactions with the same billing staff both dealerships shared.

Viewing the facts in the light most favorable to Parrish and drawing fair inferences in her favor, a rational jury could reasonably conclude that Parrish's problems with the Acura salespeople could have been related to Gallagher's response to Parrish's complaint to Sollecito. Here, the decision to terminate Parrish was made by the very supervisor she charged with harassment and the corporate officer to whom she complained and who allegedly took no action.

### D. *CONSTRUCTIVE DISCHARGE*

The Court notes that Parrish's complaint does not plead constructive discharge as a distinct cause of action. Rather, the complaint specifically states two claims. The First Claim is asserted against Acura and Honda and alleges sexual harassment and retaliation in violation of Title VII. (Compl.¶¶ 23, 24.) The Second Claim is brought against Sollecito and Gallagher and charges discrimination and retaliation under the New York Executive Law. (Compl.¶¶ 25, 26, 27.)

Paragraph 20 of the complaint does contain language that, broadly construed, could be taken to allude to an allegation of constructive discharge. It states that Parrish's termination from Acura reduced her income by nearly 50 percent and "was intended by Defendants to coerce her resignation to the extent that she retained job duties with respect to Honda." It is not clear whether this statement is meant to describe specific evidence of an unlawful employment practice to satisfy the *prima facie* elements of Parrish's Title VII

claims, or to assert a discrete state-law, contractually grounded, constructive discharge cause of action, or both. Assuming that the pleading of a separate constructive discharge claim was intended, the complaint does not specify against which of the four Defendants the claim is asserted. Whether the claim could properly be brought against all of the Defendants and whether the evidence on the record would support liability as to all, presents different conceptual and practical issues.

Anticipating a constructive discharge claim not explicitly articulated in Parrish's complaint, Defendants address the issue in a preemptive footnote in their motion brief. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated July 31, 2002, at 17 n. 10.) Parrish does expressly present a constructive discharge argument in her responsive papers. Defendants' Reply, however, offers no rebuttal, leaving unclear whether their failure to squarely express further opposition signals a waiver or a withdrawal of additional objections.

Under the circumstances, the Court will not address the matter further, pending clarification from the parties as to their contemplation in this regard.

By way of guidance, the Court notes the applicable standard governing constructive discharge. The Supreme Court has recognized that an employer may be deemed to have discharged an employee "not only when it directly dismisses an employee but also when it purposely creates working conditions so intolerable that the employee has no option but to resign...." *Sure–Tan, Inc. v. National Labor Relations Bd.*, 467 U.S. 883, 894, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); *see also Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir.1993) (noting that the standard requires the employer deliberately to render working conditions "'so difficult or un-pleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'") (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)); *Gonzalez v. Bratton*, 147 F.Supp.2d 180, 197–98 (S.D.N.Y.2001).

The test thus embodies three elements: the working conditions (1) must be sufficiently intolerable; (2) the unpleasantness must be assessed objectively; and (3) the employer's actions must be intentional, purposely designed to compel the employee to resign. In many employment discrimination cases, the evidence that would support the establishment of these elements is likely to overlap substantially with the facts that form the predicates for related claims of discrimination, especially the severity of the employer's conduct and its effect on rendering the victim's working conditions intolerable, the objective standard for measuring the employee's response, and the employer's true motive for taking the adverse actions alleged to constitute constructive discharge. Accordingly, in any assessment of a constructive discharge claim interposed here, the Court's findings with respect to Parrish's Title VII claims are likely to depend significantly on whether Parrish can sufficiently plead the elements of constructive discharge as a distinct cause of action.

## III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that Defendants' motion for summary judgment is DENIED; and it is finally

**ORDERED** that trial of this action is scheduled to commence at 9:00 a.m. on April 7, 2003. The Joint Pre–Trial Order and related documents shall be filed by March 7, 2003. A final pretrial conference

is scheduled for March 28, 2003 at 2:00 p.m.

**SO ORDERED.**