WIGGINS, Justice (dissenting).
A majority of the members of this court holds the allegations of sexual harassment do not amount to "willful misconduct or maladministration in office" warranting removal. I disagree with this conclusion and must dissent. I would find the State provided sufficient evidence to show willful misconduct on the part of Abraham Watkins. My starting point is the statute.
I. Iowa Code Section 66.1A(2).
This case turns on the proper interpretation of Iowa Code section 66.1A(2). This section provides,
Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:
....
2. For willful misconduct or maladministration in office.
Iowa Code § 66.1A(2) (2015).
We defined the phrase "willful misconduct or maladministration in office" in State v. Callaway , 268 N.W.2d 841, 842 (Iowa 1978). In defining the phrase, we said,
In order to establish "willful misconduct" as a ground for removal, it is necessary to show a breach of duty committed knowingly and with a purpose to do wrong. This requires proof of grave misconduct. Of course, such misconduct would also be "maladministration in office" within the meaning of [ section 66.1A(2) ].
Id. (citations omitted).
II. Types of Sexual Harassment: Quid Pro Quo and Hostile Work Environment.
Our laws prohibit sexual discrimination. E.g. , Iowa Code § 216.6(1)(a ). The plurality correctly points out the law prohibits two types of sexual discrimination in the form of sexual harassment-quid pro quo and hostile work environment. See McElroy v. State , 637 N.W.2d 488, 499 (Iowa 2001) ; see also Vivian v. Madison , 601 N.W.2d 872, 873 (Iowa 1999) (stating the legislature modeled the Iowa Civil Rights Act after Title VII of the United States *862 Civil Rights Act); Lynch v. City of Des Moines , 454 N.W.2d 827, 833 (Iowa 1990) (holding that sexually hostile work environment is illegal sex discrimination pursuant to the Iowa Civil Rights Act). The former is a "type of harassment [that] is linked to the grant or denial of tangible aspects of employment." McElroy , 637 N.W.2d at 499. The latter involves "sexual harassment [that] is so 'severe or pervasive [as] "to alter the conditions of [the victim's] employment and create an abusive working environment." ' " Id. (third alteration in original) (quoting Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) ).
Although the plurality recognizes the two types of sexual harassment, it downplays the detrimental effects of hostile work environment. In fact, the plurality reasons the record does not show that Watkins sought to misuse his authority as county attorney to obtain sexual favors from Jasmin Wallingford or anyone else. Had Watkins offered any one of these women advancement in return for sexual favors-a classic quid pro quo situation, even if he made such an offer outside the workplace-I am confident the plurality would decide this case differently. Certainly, hostile work environment may be more subtle than quid pro quo. Subtleness, however, does not necessarily minimize the inimical impact of sexual harassment on victims. In other words, hostile work environment is not a lesser form of sexual harassment.
We have stated, "A hostile work environment claim is premised on the concept that sexual harassment can impact the conditions of employment well beyond the denial or granting of economic or tangible benefits ." Id. (emphasis added). Thus, quid pro quo involves a narrow sliver of the types of employment conditions that sexual harassment adversely affects. The plurality should not give more weight to this narrow sliver by de-emphasizing the severity of other adverse alterations of employment conditions, such as noncontractual consequences. "[W]hen an employer creates a hostile work environment, employees are forced to 'run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living ....' " Id. (second alteration in original) (quoting Meritor Sav. Bank , 477 U.S. at 67, 106 S.Ct. at 2405 ). "[T]he employee must endure an unreasonably offensive environment or quit working." Id. at 499-500.
I cannot stress enough that sexual harassment, in whatever form it manifests, detrimentally affects victims. See Lucetta Pope, Everything You Ever Wanted to Know About Sexual Harassment but Were Too Politically Correct to Ask (or, the Use and Abuse of 'But For' Analysis in Sexual Harassment Law Under Title VII) , 30 Sw. U. L. Rev. 253, 259 (2001) [hereinafter Pope] ("[D]ifferent forms of sexual harassment also produce the same effect."). Catharine A. MacKinnon, a prominent legal theorist, traced the impact of sexual harassment. Catharine A. MacKinnon, Sexual Harassment of Working Women: A Case of Sex Discrimination 47-55 (1979) [hereinafter MacKinnon]. She stated, "Like women who are raped, sexually harassed women feel humiliated, degraded, ashamed, embarrassed, and cheap, as well as angry." Id. at 47. She further asserted, "Faced with the spectre of unemployment, discrimination in the job market, and a good possibility of repeated incidents elsewhere, women usually try to endure." Id. at 52. However, "the costs of endurance can be very high, including physical as well as psychological damage" from anxiety to all kinds of nervous tics which are "the inevitable backlash of the human body in response to intolerable stress." Id. (quoting Special Disadvantages of Women in *863 Male-Dominated Work Settings 6, in Women in Blue-Collar, Service and Clerical Occupations: Hearings Before the Comm'n on Human Rights of the City of N.Y. (1979) (testimony of Lin Farley)).
Sexual harassment, as a broad category including both quid pro quo and hostile work environment, "has devastating effects on a woman's economic and employment opportunities" and "tends to be equally disastrous to a woman's physical health and psychological well-being." Jennifer L. Vinciguerra, Note, The Present State of Sexual Harassment Law: Perpetuating Post Traumatic Stress Disorder in Sexually Harassed Women , 42 Clev. St. L. Rev. 301, 305-06 (1994) (footnotes omitted). In fact, "[p]ost [t]raumatic [s]tress [d]isorder is a common result in women who have suffered sexual harassment in the workplace." Id. at 303 & n.18 (collecting cases).
Moreover, in Meritor Savings Bank , the United States Supreme Court established that both types of sexual harassment-quid pro quo and hostile work environment-are equally illegal and actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). See 477 U.S. at 63-67, 106 S.Ct. at 2404-05. I do not believe quid pro quo is worse than hostile work environment. Rather, both types of sexual harassment are two sides of the same coin,[8] and the plurality should give each type its due weight. See Pope, 30 Sw. U. L. Rev. at 258-59 ("[Q]uid pro quo and hostile environment claims amount merely to alternative varieties .... MacKinnon's scheme of quid pro quo and hostile environment claims followed the radical view that seemingly diverse forms of sexual harassment spring from the same discriminatory intent." (Footnote omitted.)).
Hostile-work-environment claims may lead to the same result as quid pro quo claims: the loss of a job. Specifically, a hostile work environment affects an employee's tangible job conditions when it results in the employee's constructive discharge. U.S. Equal Emp. Opportunity Comm'n, N-915-050, Policy Guidance on Current Issues of Sexual Harassment (1990), https://www.eeoc.gov/policy/docs/currentissues.html (last modified June 21, 1999). Constructive discharge involves an employee's resignation because his or her working conditions have become "so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders , 542 U.S. 129, 147, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004).
III. Willful Misconduct.
A. Misconduct. In another effort to lessen the magnitude of Watkins's willful misconduct, the plurality reasons a number of the incidents and comments occurred outside of the workplace because Wallingford was a close family friend who frequently engaged in social activities with Watkins and his wife. Although not all interactions with supervisors or coworkers far away from the water cooler may constitute grounds for a sexual-harassment claim, employers may very well be liable for sexual harassment outside of the workplace.
In Parrish , the United States District Court for the Southern District of New York stated,
The court is aware of no settled law that ... allow[s] a harasser to pick and choose the venue for his assaults so as to not account for those that occur physically outside the workplace. The employment relationship cannot be so finely and facilely parsed. It comprises multiple dimensions of time and place that *864 cannot be mechanically confined within the precise clockwork and four walls of the office. The proper focus of sexual harassment jurisprudence is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it, on whether the employer has created a hostile or abusive "work environment," or a "workplace" where sexual offenses occur and are sufficiently severe or pervasive to alter the victim's terms and conditions of employment wherever the employment relationship reasonably carries.
Parrish v. Sollecito , 249 F.Supp.2d 342, 350-51 (S.D.N.Y. 2003).
The court acknowledged, "[A]s a practical matter[,] an employment relationship and the employee's corresponding status, while generally commencing and grounded in what constitutes the office or plant, often carries beyond the work station's physical bounds and regular hours." Id. at 351. Moreover, the court noted employees travel on the road for business trips and interact "at business-related meals and social events." Id. The court also noted "they may encounter one another in external contexts not strictly stemming from or compelled by a business purpose ." Id. (emphasis added). The real focus, the court reasoned, should be "the degree to which, wherever a sexual assault occurs, its consequences may be felt in the victim's 'workplace' or 'work environment' and be brought to bear on her terms and conditions of employment." Id. I agree with the Parrish court's holistic approach.
In our modern times, technological forms of communication, such as texting, take incidents at the water cooler to locations beyond the office. Behaviors outside of the workplace may very well seep into the environment at the workplace, contributing to a hostile work environment. Wouldn't a victim whose supervisor subjects her to harassment over the weekend feel uncomfortable, anxious, and fearful of her supervisor when she sees him back at work on Monday? I would answer yes.
Additionally, the plurality discounts the district court's use of the Iowa Rules of Professional Conduct. I again disagree. In deciding these removal cases, we have used the Law Enforcement Code of Ethics to support the removal of a sheriff from office. See Callaway , 268 N.W.2d at 848. Similarly, a breach of the Iowa Rules of Professional Conduct is relevant in deciding whether Watkins engaged in misconduct.
Furthermore, I find Watkins violated the Restatement (Third) of the Law Governing Lawyers § 56, at 416 (Am. Law Inst. 2000). It provides, "[A] lawyer is subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances." Id. Comment k to section 56 states, "Employees of lawyers. A lawyer who hires a lawyer or nonlawyer as an employee is subject to applicable law governing the employment relationship, such as contract law, antidiscrimination legislation, unjust-discharge law, and labor relations law." Id. § 56 cmt. k , at 420-21.
To dilute even further the gravity of Watkins's sexual harassment of Wallingford, the plurality states that most of Watkins's repugnant behavior did not concern Wallingford herself. Yet the acts of spewing abhorrent comments about other women and showing nude photographs of his wife to Wallingford constitute sexual harassment targeted at Wallingford. Would Wallingford feel any less of a victim simply because, after seeing an overweight woman, Watkins told Wallingford, "Man, I wouldn't want to see her naked"? Or when Watkins commented to Wallingford about a courthouse employee's breasts and wondered if they were "really that big"? Or *865 when Watkins complained to Wallingford that his wife "never wanted to have sex" and he wished his wife would want to have sex all the time? Or when Watkins told Wallingford he was glad he kept nude photographs of his previous girlfriends? Wallingford is no less a victim of sexual harassment simply because the comments and photographs did not concern herself in the most literal sense.
Let us not forget the comments concerning Wallingford herself. For example, on three or four occasions, Watkins asked Wallingford if "her vagina was still broke."
Under this record, I would affirm the district court's finding that Watkins committed misconduct in office by establishing and maintaining a hostile work environment.
B. Willful. Having determined Watkins committed misconduct, the next question is whether Watkins committed the misconduct willfully. I agree with Chief Justice Cady's analysis of the willful nature of Watkins's misconduct.
We have defined "willful" in the context of section 66.1A(2) to be misconduct "committed knowingly and with a purpose to do wrong." Callaway , 268 N.W.2d at 842. The repeated nature of the misconduct in question here requires me to find that Watkins engaged in it knowingly.
Moreover, at least one comment provides direct evidence that Watkins knew exactly what he was doing. When his former child-care worker returned his missed phone call and explained she was in the shower, Watkins told her that she should have FaceTimed him while in the shower and then stated, "[T]his is probably why I'm in trouble for sexual harassment." This statement clearly shows Watkins had the requisite knowledge that he was engaging in sexual harassment. Watkins was not naïve. I doubt his other comments and actions of similar nature came from mere thoughtlessness or even recklessness. See State ex rel. Barker v. Meek , 148 Iowa 671, 674, 127 N.W. 1023, 1024 (1910) ("Conduct may be voluntary, thoughtless, or even reckless, yet not necessarily willful.").
Additionally, I find Watkins engaged in such misconduct for a bad or evil purpose. See State v. Roth , 162 Iowa 638, 651, 144 N.W. 339, 344 (1913) (stating "willfully" means the public official acted "intentionally, deliberately, with a bad or evil purpose, contrary to known duty"). He did not mean his misconduct or words to be funny. The nature of his misconduct and words were hurtful to the recipients. It is okay to make jokes but not about other people or their problems. Our law has no room to accommodate Watkins's willful, sexually degrading, demoralizing, and reprehensible behavior.
I find no merit in the rationale the plurality uses to corroborate its conclusion that Watkins did not act with a bad or evil purpose. What I find particularly preposterous is the plurality's unwarranted dilution of Watkins's harassing behavior because the environment included joking, teasing, and sarcastic remarks. I am disinclined to believe any reasonable person in a similar situation would find Watkins's harassment even remotely amusing. I am also disinclined to believe Watkins subjectively believed he meant no harm. The reasoning the plurality uses to discount Watkins's misconduct sounds to me like the good-old-boy excuse. This excuse has absolutely no place in our law.
I also find no merit in the plurality's emphasis on Wallingford's close relationship with Watkins and his wife, as if to excuse Watkins's behavior simply because he was like family to Wallingford. The plurality's sympathetic portrayal of Watkins as a close family friend who meant no harm is misplaced. A familial-like relationship *866 should discourage rather than foster a crude, demeaning, sexually charged work environment.
IV. Conclusion.
Based on the forgoing reasons, I would affirm the judgment of the district court. We must stop making excuses. Enough is enough. Sexual harassment is a real problem affecting real individuals. Moreover, "[s]exual harassment perpetuates the interlocked structure by which women have been kept sexually in thrall to men and at the bottom of the labor market." MacKinnon at 174.

It should be noted that hostile work environment is "[l]ess clear[ ] and undoubtedly more pervasive" than quid pro quo. MacKinnon, at 40.