STATE of Iowa, Appellee,

v.

Robert D. CALLAWAY, Appellant.

No. 60296.

Supreme Court of Iowa.

July 26, 1978.

Donald C. Wilson and James C. Wilson, of Lundy, Butler, Wilson & Hall, Eldora, for appellant.

Harold A. Young, Asst. Atty. Gen., Jim R. Sween, County Atty., and James P. Walters, Asst. County Atty., for appellee.

Considered by MOORE, C. J., and RAWLINGS, UHLENHOPP, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

The trial court entered judgment removing defendant Robert D. Callaway from office as sheriff of Hardin County on the ground of willful misconduct or maladministration in office under § 66.1(2), The Code. The sole question on defendant's appeal is whether the State carried its burden of proof. Upon our *de novo* review of the evidence, we affirm the trial court.

The removal petition, which was filed in the name of the State by the Hardin County attorney on January 21, 1977, alleged defendant should be removed from office because of physical assaults on prisoners in five separate incidents.

Under § 66.1(2), The Code, an elective officer may be removed from office by the district court "[f]or willful misconduct or maladministration in office." The petition may be filed by the county attorney when the official is a county or municipal officer. § 66.3(5), The Code. When the petition is properly supported the officer may be suspended from office pending determination of the merits. § 66.7, The Code. That procedure was followed here.

The removal proceeding is summary in nature and triable in equity. § 66.18, The Code. The burden is on the State to prove the alleged ground for removal by evidence which is clear, satisfactory and convincing. *State v. Bartz,* 224 N.W.2d 632, 638 (Iowa 1974).

Removal is drastic and penal. *State ex rel. Fletcher v. Naumann,* 213 Iowa 418, 427, 239 N.W. 93, 97 (1931). The object "is to rid the community of a corrupt, incapable or unworthy official." *State v. Welsh,* 109 Iowa 19, 21, 79 N.W. 369, 370 (1899).

In order to establish "willful misconduct" as a ground for removal, it is necessary to show a breach of duty committed knowingly and with a purpose to do wrong. *State ex rel. Barker v. Meek,* 148 Iowa 671, 127 N.W. 1023 (1910). This requires proof of grave misconduct. *State ex rel. Cochran v. Zeigler,* 199 Iowa 392, 202 N.W. 94 (1925). Of course, such misconduct would also be "maladministration in office" within the meaning of § 66.1(2).

The State relies on five incidents which it contends demonstrate such misconduct in the present case. In each instance the State offered the testimony of law enforcement officers who were eyewitnesses to the events. We believe the facts found by the trial court were established by clear, satisfactory and convincing evidence and therefore adopt them as our own. They are as follows:

1. *The Rotgers incident.* "At approximately 2:00 a. m. on the morning of April 12, 1975, Brian Rotgers, then nineteen years old, was driving north toward Iowa Falls on U.S. Highway 65 and very substantially exceeding the speed limit. Prior to this, he had consumed a large quantity of alcoholic beverages. The defendant was on patrol

and in following Rotgers clocked his speed at 76 miles per hour. He followed Rotgers for a short distance and turned on his flashing red lights to indicate that Rotgers should stop. Rotgers 'panicked' and attempted to elude the defendant. He drove at a very high speed towards Iowa Falls and turned to the east on a gravel road just at the southern edge of town.

"The defendant had radioed for help in this high speed chase and received assistance from deputy sheriff Warren Crosser and chief of police Jerry Sunken and officer Richard Newgaard of the Iowa Falls police department.

"In response to radio instructions from the defendant, Deputy Crosser set up a road block, which Rotgers ignored. When Rotgers 'ran' the roadblock, on instructions from defendant, Deputy Crosser shot at Rotger's vehicle with his shotgun. This shot struck the left front portion of the automobile and deflated the left front tire. Several miles past the roadblock, Rotgers lost control of his car and it went into the ditch without injuring him. At this point the road was situated so that there was no shoulder and the ditch was very steep and approximately twelve feet deep.

"The Iowa Falls officers arrived first and brought Rotgers out of the ditch, placing him under arrest, and handcuffed his hands behind his back. The defendant then arrived and got out of his car, and approached Rotgers who was standing 'looking scared' between two peace officers. Rotgers was standing within a foot or so of the edge of the steep ditch with his back to the ditch. As the defendant approached Rotgers, he recognized him as he knew him by sight and also knew that Rotgers had no criminal record.

"The defendant said 'something' that none of the officers present could remember, brought his foot up and kicked Rotgers in the chest, knocking him backward into the twelve-foot ditch. He landed within eighteen inches of his automobile.

"All of the officers involved testified that Rotgers said nothing nor did he make any movements of any kind toward the defendant, nor did he threaten the other officers in any way. Chief Sunken stated, referring to Rotgers, 'he was just standing there looking scared.'

"With reference to the instructions to deputy Crosser to fire on the fleeing vehicle, the defendant testified that in his training, apparently in the military police, this was a recommended method to 'mark a vehicle' so that it could be identified in the event the chase was unsuccessful and the vehicle had to be located later. Chief Sunken testified that although he had attended the Iowa Law Enforcement Academy and undergone training at the University of Iowa in law enforcement, he had never heard of any approved police practice of firing a shotgun at an automobile to 'mark a vehicle.' * * * *"

2. *The McStockard incident.* "On December 16, 1975, Danny McStockard, who was not a large person physically, was arrested by deputy sheriff Loren Goodknight on a charge of terrorizing the inhabitants of a dwelling. Deputy Goodknight brought him to the sheriff's office without handcuffs and was seated at a table in the kitchen of the sheriff's office talking to McStockard and 'trying to calm him down'.

"McStockard had a considerable history with the sheriff's department, and on a previous occasion had been physically arrested by deputy Warren Crosser who had been forced to subdue him, handcuff him, and finally put him in leg irons because of his kicking. It was known to the defendant and his deputies that McStockard had a bad temper, especially when he had been drinking. Deputy Crosser made the statement that the only thing for McStockard when he had been drinking was physical force.

"The defendant and deputy Crosser came into the kitchen where deputy Goodknight and McStockard were seated at the table. The Defendant asked if McStockard had been searched and was told by Goodknight that he had not. He then directed Crosser to 'frisk' McStockard. McStockard stood up and deputy Crosser was in the act of 'patting him down' when, as all three officers

agree, McStockard 'went for his pocket' with his right hand. He was grabbed and thrown to the floor, and held down by Goodknight, Crosser and the defendant.

"There was abundant ground for the officers to take the action they did under the circumstances and with their knowledge of McStockard's background.

"What happened next is in dispute. The defendant testified that McStockard was kicking and cursing and that he (defendant) hit McStockard twice on his back to bring him under control.

"Deputy Crosser testified that after McStockard's sudden move 'for his pocket', 'we all wound by on the floor'. He then testified that he, deputy Goodknight, and the defendant were holding McStockard down and defendant hit McStockard in the chest area several times with his fist.

"Deputy Goodknight testified to the same circumstances and stated that when McStockard was down and held by the two deputies, the defendant struck three to six blows with his fist to McStockard's chest and neck area. Deputy Goodknight also stated that 'McStockard was subdued when he was struck'.

"On cross-examination, the defendant testified that he knew deputy Crosser had subdued McStockard alone without any blows from his fist a month before the incident and stated that he was 'not denying that it could have happened' that he hit McStockard in the neck and chest with his fist.

"The Court finds the facts to be in accord with the basic testimony of deputy Crosser and deputy Goodknight that the defendant did strike Danny McStockard in the chest and neck area with his fist when McStockard was subdued and held by the two deputies."

3. *The Schories incident.* "On February 19, 1976, Tony Schories, now a 22-year old resident of the Men's Reformatory at Anamosa, Iowa, was arrested in Hardin County on suspicion of breaking and entering. He was questioned for some time in the sheriff's office by the defendant and deputy Warren Crosser. At about 3:00 a. m., the defendant instructed deputy Jerry Kadner to take Schories upstairs to a cell and get his consent to search his motor vehicle.

"Deputy Kadner placed Schories in a cell, and when asked for the consent, Schories replied that he wanted some cigarettes. Kadner asked the defendant if he could give him cigarettes, and the defendant stated that he could if Schories would cooperate in the matter of the search. Deputy Kadner took cigarettes to Schories, and asked some questions, but Schories refused to answer or cooperate.

"When Deputy Kadner reported this to the defendant, he was instructed to retrieve the cigarettes. Schories refused to surrender them to Kadner who reported this to the defendant. The defendant took the cell keys from deputy Kadner, opened the cell and asked Schories for the cigarettes.

"The defendant had previously been advised that Schories had a criminal record of non-violent property crimes.

"Schories held the cigarettes behind his back, refusing to turn them over to the defendant. At that point, the defendant grabbed Schories by his hair, threw him to the floor, and struck him with his fists several times. Deputy Kadner took the cigarettes and the incident ended.

"Russel Gast, owner of an Eldora bowling lane, was serving as night shift dispatcher in the sheriff's office at the time of this incident. He testified to the conversation between deputy Kadner and the defendant with respect to the cigarettes, and also testified that there was an intercom set up with controls at the dispatcher's desk so that the dispatcher could hear what was said in the jail. He testified that the intercom was functioning during this incident and that he heard screaming from the jail area with Schories saying, 'Don't! Don't! Help! Don't! Don't! Don't!'

"Mr. Gast further testified that when the defendant returned to the office area after the incident, he stated, 'That will show him who is boss,' and, 'That will be lesson number one for Mr. Kadner'.

"On cross-examination the defendant stated that Schories had made no threatening moves or remarks and further admitted pulling him to the floor and striking him with his fists.

"The Court finds the facts to be in accord with that set forth above."

4. *The Chaplin incident.* "In the early morning hours of January 4, 1977, deputy Jerry Kadner stopped a van in the town of Hubbard which was driven by an individual named Smuck and in which Kevin Chaplin was a passenger. Deputy Kadner called for assistance, and deputy Warren Crosser and the defendant responded. Smuck submitted to arrest without incident, but Chaplin walked away from deputy Kadner after threatening to kick his teeth in, and walked around the fire station, in front of which the van and the deputy's car were parked. Both Smuck and Chaplin were intoxicated at the time. There had been a fresh snow and deputy Kadner followed Chaplin's tracks after handcuffing Smuck and placing him in the rear of his patrol car. He caught up with Chaplin at the corner of the building, and after some resistance, Chaplin was subdued by two blows on his leg with deputy Kadner's nightstick. Deputy Kadner handcuffed Chaplin's hands behind his back and placed him in the rear of his patrol car.

"At this point in his career, deputy Kadner had not attended the Iowa Law Enforcement Academy and was not trained or qualified in the processing of individuals charged with operation of a motor vehicle while under the influence of an intoxicating beverage.

"Deputy Warren Crosser arrived after the subject had been handcuffed and Smuck was transferred by the deputies to the Crosser patrol car where deputy Crosser was to process him for suspicion of O.M.V. U.I.

"At this point the defendant arrived and was advised by Kadner of the circumstances of the arrest. The defendant had a substantial history of involvement with Chaplin and a number of his friends, including previous arrests where weapons were found, situations of disturbing the peace, and tavern brawling, and threats to deputy Kadner.

"Deputy Kadner indicated to the defendant that he was going to take Chaplin to the hospital for a check-up. This was in accord with the instructions he received during a course in law enforcement training on the use of a nightstick and the necessity for obtaining an examination of any subject who had been hit with a nightstick. The defendant was not familiar with this course.

"The defendant then climbed into the back seat of the two-door car where Chaplin was seated. Deputy Kadner was looking directly at Chaplin and stated that the only remark Chaplin made was to greet the defendant by saying 'Hi, Bob'. The defendant said, 'I told you not to fuck with any of my men.' The defendant then gave Chaplin a backhand blow to the face and began to beat him with his fists. Both deputy Kadner and deputy Crosser stated that the beating lasted for some time and that Chaplin was struck repeatedly. The beating was of such a substantial duration that deputy Kadner went over to deputy Crosser's patrol vehicle and asked him what he should do. Deputy Crosser made no response other than to shrug his shoulders and at about this time the defendant stopped striking Chaplin.

"The defendant testified with respect to the Chaplin incident and admitted that he realized at the time that it was a 'mistake'. He also stated that when greeting him Chaplin threatened to get Kadner and that in response he slapped Chaplin twice. This testimony is in direct conflict with deputy Kadner's sworn testimony that he was looking directly at Chaplin until he was struck by the defendant's fists and saw no lip movement nor did he hear Chaplin make any threat, and is also in direct conflict with deputy Crosser's testimony that he was struck repeatedly with the defendant's fists.

"On cross-examination, the defendant conceded that at the time of the incident

Chaplin was in the back seat of the patrol car subdued and handcuffed with his hands behind his back. Defendant further conceded that Chaplin then posed no danger to anyone and was not verbally abusing anyone. Defendant also acknowledged that he was aware previously from law enforcement training that words alone do not justify a peace officer in making a physical response.

"The Court finds the facts to be in accord with the testimony of deputies Crosser and Kadner, rather than with the testimony of the defendant."

5. *The Silvey incident.* "In the early morning hours of January 14, 1977, the proprietor of a tavern and nightclub located on the outskirts of Iowa Falls, but outside the city limits, called law enforcement authorities for assistance with an unruly customer, Tony Silvey. The name of the establishment is the Copper Axe. Silvey was known to the sheriff's department and to the Iowa Falls police department as a trouble-maker and brawler who was especially belligerent when he had been drinking.

"Because of this knowledge of Silvey's character, a relatively large number of law officers responded to the call. By the time the first officers arrived, Silvey had left the Copper Axe. In hunting for him, he was found in the vicinity of an old sale barn by Francis Ites of the Iowa Falls police department. At the command of officer Ites, Silvey came out of some weeds into a parking area close by the officer's patrol car. He was cursing and abusive verbally, and shaking his finger in the officer's face, but otherwise not physically aggressive.

"Ites told him he was under arrest for his conduct at the tavern, which had included breaking of glasses. Silvey stuck out his hands in front to be handcuffed and in response to a statement from officer Ites, turned and laced his hands behind his back saying, in effect, that, 'I guess you want to handcuff me behind my back.' Officer Ites placed the handcuffs on Silvey. During this time, he had been joined by officer Richard Newgaard and officer Rodney Stoner of the Iowa Falls police department.

At this time Silvey was handcuffed and backed up to the patrol car with officer Ites on his right and officer Stoner on his left. In the words of several of the officers, he was giving him no difficulty other than excessively profane language. At this point, the defendant arrived and said 'Silvey, shut the blank up'. The defendant then sprayed mace in Silvey's face.

"All of the officers testified that Silvey kept his eyes closed and they were watery and runny. As the officers were placing Silvey in the patrol car to take him to the Iowa Falls police department, the defendant shoved him on the buttocks with his foot.

"Silvey was then taken to the Iowa Falls police department with the officers again testifying that his eyes were closed, although his verbal abuse and profanity continued. Silvey was taken to the identification room in the company of the defendant and officer Newgaard. The defendant shut the door to the identification room. Silvey was standing by what was described as a fingerprinting cabinet with his back to the wall. He continued to be verbally abusive, and the defendant again sprayed mace in his face. His hands were still cuffed behind his back.

"Silvey was blowing phlegm from his mouth and nose, with his eyes still closed. At this point, the defendant struck Silvey on the side of his face with his ticket book, then grabbed Silvey by the neck, pushed him against the wall, and kneed him in the groin.

"Officer Newgaard then took Silvey to the jail area and uncuffed him. He testified that he saw no physical threat or motion by Silvey at any time, just verbal abuse.

"The defendant's testimony was somewhat at variance with that of the other officers present, but the Court finds the facts to be as testified to by the other officers and as above set forth."

The trial court did not accept defendant's testimony where it differed from that of the other witnesses to the incidents. Nor do we.

Apart from denying material parts of the evidence of misconduct, defendant offered evidence through his own testimony and that of numerous other witnesses tending to show he was a hard-working, efficient and competent sheriff. He introduced considerable character and reputation evidence. He sought to show the incidents of alleged misconduct were no more than brief, stress-induced aberrations from otherwise impeccable attention to duty.

In an effort to counter this evidence the State offered evidence that many of defendant's claims of accomplishment as sheriff were false, misleading or inflated.

In addition, the State showed that on one occasion defendant allowed two prisoners to leave jail and ride with him on patrol. He allowed the same two prisoners to drive a patrol car equipped with a shotgun, rifle and ammunition by themselves. Moreover, he once armed one of the prisoners with a loaded shotgun and used him to assist in an arrest. This handling of prisoners was in apparent violation of §§ 356.26, 356.27, The Code.

The State also offered evidence relating to defendant's striking of a 15-year old girl who had been apprehended after running away from Quakerdale, his kicking and hitting of a handcuffed boy who had been caught after running away from Eldora, and his alleged overreacting to an incident in which a teenager yelled an epithet at him.

The State's basic contention is that defendant's conduct reflects a pattern of assaulting prisoners without justification. We agree.

Officers are prohibited from treating prisoners in a cruel or inhuman manner by § 356.23, The Code. Further, they have a duty to protect prisoners from insult and annoyance. § 356.24, The Code.

Even though defendant admits his conduct in the Rotgers and Chaplin incidents was a "mistake", albeit due to excusable stress, he defends his use of force in the other incidents. This defense depends in part upon his credibility, and, like the trial court, we have accepted the testimony of the other eyewitnesses over that of defendant. However, this defense also depends on distorting the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner.

The common-law standard is as follows:

An officer who is making a lawful arrest, or who has made an arrest, is justified in using such force as is reasonably necessary to secure and detain the offender, overcome his resistance, prevent his escape, recapture him if he escapes, and protect himself from bodily harm. 6A C.J.S. Arrest § 49 at 112.

At all times material here, the same standard was applicable under § 755.2, The Code, 1975:

An arrest is made by an actual restraint of the person to be arrested, or by submission to the custody of the person making the arrest. No unnecessary force or violence shall be used in making the same, and the person arrested shall not be subjected to any greater restraint than is necessary for his detention.

See also § 804.8, The Code, 1977 Supp. Defendant plainly breached this standard in the five principal incidents relied on by the State.

The authorities uniformly agree that such misconduct by a law enforcement officer is a ground for ouster from office. See, e. g., *Swars v. Council of City of Vallejo,* 33 Cal.2d 867, 206 P.2d 355 (1949) (beating of an intoxicated prisoner); *Kulczyk v. Board of Fire & Police Comm'rs.,* 344 Ill.App. 555, 101 N.E.2d 626 (1951) (excessive force in making an arrest); *State ex rel. Boynton v. Jackson,* 139 Kan. 744, 33 P.2d 118 (1934) (beating of prisoner to obtain a confession); *Bd. of Police Comm'rs. of Borough of Leonia v. Olson,* 101 N.J.Super. 565, 245 A.2d 54 (1968) (unnecessary force in handling prisoner); *Collins v. Codd,* 38 N.Y.2d 269, 379 N.Y.S.2d 733, 342 N.E.2d 524 (1976) (unnecessary force against arrested person); *Harless v. Bichsel,* 327 S.W.2d 791 (Tex.Civ. App.1959) (unnecessary force in handling prisoner); Annot., 100 A.L.R. 1401; 70 Am. Jur.2d Sheriffs, Police, and Constables § 13

at 141 ("the general rule is that the mistreatment by a sheriff or police officer of a prisoner in his custody is a sufficient ground to justify his removal from office").

On this basis, the State proved defendant was guilty of willful misconduct in office within the meaning of § 66.1(2), and his removal is therefore warranted.

Despite defendant's effort to mitigate his conduct through showing his general effectiveness and competency, as well as the stress under which a law enforcement officer must perform his duty, we think removal is essential. This is not a case of a momentary lapse or of a few mistakes in judgment in routine matters. It is a case of repeated, deliberate brutality to prisoners. The conduct shown here is antithetical to the professionalism which the public requires and generally receives from law enforcement officers. In fact, it contradicts the standards which peace officers have established for themselves.

This is implicitly and explicitly illustrated in the present record. It is implicit in the forthright and candid testimony of nine law enforcement officers who testified as eyewitnesses to defendant's behavior. It is explicit in the testimony of John J. Quinn, a veteran law enforcement officer and instructor at the Iowa Law Enforcement Academy. He said the academy teaches the general legal standard regarding the use of force by officers. When characterizing the use of force by an officer when a prisoner has ceased resisting or is not resisting, he identified it as "corporal punishment". No more apt term could be used to describe defendant's use of force in the incidents involved here.

Emotional stress is an explanation but not an excuse. Police work is difficult and demanding; the pressures are intense. Officers must have the emotional stability to bear them. When they do not, they cannot remain in police work. See President's Commission on Law Enforcement, Task Force Report: The Police, p. 129 (1967) ("The emotional stability to withstand the stresses of police work must, of necessity, be a primary requisite of police personnel.

Officers must rationally cope with violence, verbal abuse, resentment, and emergencies.").

This theme is underscored in the Law Enforcement Code of Ethics which has been adopted by most law enforcement agencies since its promulgation in 1957. In material part, the credo of a law enforcement officer is as follows:

As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

I will * * * maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others.

   *     *     *     *     *     *

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence * * *.

   *     *     *     *     *     *

See L. Schwartz and S. Goldstein, Law Enforcement Handbook For Police, p. 48 (1970).

Law enforcement officers frequently work where the going is roughest. In carrying out their duties, no matter how great the temptation, they must not cross the line between firmness and tyranny.

In *Edwards v. Civil Service Comm.*, 227 Iowa 74, 80, 287 N.W. 285, 288 (1939), this court summarized the officers' responsibility as follows:

The public has a right to have for peace officers men of character, sobriety, judgment, and discretion. All officers are likely to be subjected to criticism, some-

times unjust, but no police officer should invite such criticism, either of himself or the police force as a whole, by his personal conduct.

The overwhelming majority of officers meet this responsibility despite the pressure and stress of their work. They labor against great odds, with scant recognition or reward, to keep our communities safe. They know restraint from the use of unnecessary force is a price which must be paid to preserve the rule of law in a nation dedicated to protecting basic human rights.

The present case is exceptional. Chapter 66 is designed for such cases. The trial court was correct in entering judgment removing defendant from office.

AFFIRMED.