CADY, Chief Justice (dissenting).
I respectfully dissent. Sexual harassment will not end until it is seen as serious enough to end.
Over a century ago, in 1910, a pharmacist from Floyd County named Matye Carragher challenged a law that disqualified female pharmacists from selling intoxicating liquors. In re Carragher , 149 Iowa 225, 226, 128 N.W. 352, 352 (1910). We rejected her claim. Id. at 228-30, 128 N.W. at 353-54. We rejected it not because we did not strive to do justice, but because we could not see the injustice in her claim. We simply could not see then what is perfectly evident today. Instead, what Matye Carragher saw as discrimination in 1910, we saw as a "natural and reasonable" distinction in life. Id. at 229, 128 N.W. at 354. We saw the different gender treatment in the sale of intoxicants, but only as one of many common aspects of a given profession or business in which "individuals of one sex are in general better fitted than those of the other sex." Id. at 229-30, 128 N.W. at 354. The injustice seared into that view could not be seen on that day in 1910 because the lens used to judge the facts and examine the claim was the same old *849 lens that had been used in the past. The smudges of the past obscured the injustice now fully visible in hindsight.
The value of the Carragher case today is not in its holding, but in the lesson it leaves behind. One of the most important observations that can be drawn from our legal history is justice can only replace injustice when a challenge to the law is examined through the lens of those who have been forced by our law to endure the injustices of our past. Until this is done, the past remains, as does the injustice.
The law governing the removal of public officials from office, the law governing the role of the courts in that process, and the legal framework governing the identification of sexual harassment in the workplace all support a finding of willful misconduct in this case. While the resolution of this claim ultimately lies in the eye of the beholder, our law long ago opened the door for workplace sexual harassment to be viewed as a ground for removal. Courts must simply see it.
I. Elected Officials and the Role of the Court.
The legislature is empowered to create public offices. Hutton v. State , 235 Iowa 52, 54, 16 N.W.2d 18, 19 (1944). Pursuant to this authority, the legislature is free to impose qualifications or limitations on officers as it deems expedient. The public's right to have its preferred individual serve in public office is, therefore, necessarily tempered by the legislature's authority to prescribe credentials and grounds for removal. The state's allegiance to the democratic process of elections is not superior to its allegiance to the democratic process of checks and balances established to remove errant elected officials whose conduct demonstrates their disqualification for office.
Over 150 years ago, in the first publication of the Iowa Code, the legislature saw fit to create a safety valve in order to remove certain public officials whose conduct rendered them unworthy of public office. Iowa Code § 397 (1851). Within the title governing election laws and procedures, our legislature has vested the courts with the authority to remove "officers for misfeasance, malfeasance or nonfeasance in office." 1909 Iowa Acts ch. 78. The causes are "not merely penal," as the "grounds for removal" now codified in chapter 66 "go to the question of qualification." State ex rel. Kirby v. Henderson , 145 Iowa 657, 662, 124 N.W. 767, 769 (Iowa 1910). The grounds for removal therefore do not stand opposed to, but are rather integrated within, the democratic process. The integrity of Iowa's elections is preserved when the legislature's proclaimed qualifications are enforced.
At issue in this case is whether the record contains sufficient evidence of misconduct to require Abraham Watkins's removal from office under Iowa Code chapter 66. The question is, ultimately, one of qualification. We must decide whether Watkins engaged in "willful misconduct or maladministration in office" such that he acted contrary to his duties as a county attorney and is removable under section 66.1A(2) (2015). Under our system of government, the responsibility to interpret section 66.1A and decide this question lies with this court.
II. Analytical Framework.
In interpreting the removal provision, we are mindful that the legislature, through chapter 66, sought to "rid the community of ... corrupt, incapable or unworthy official[s]." State v. Callaway , 268 N.W.2d 841, 842 (Iowa 1978) (quoting State v. Welsh , 109 Iowa 19, 21, 79 N.W. 369, 370 (1899) ). The statute's core purpose *850 "is for the public benefit and to protect the public interest." City of Des Moines v. Dist. Ct. , 241 Iowa 256, 263, 41 N.W.2d 36, 39 (1950). The legislature, therefore, imbued the courts with the power to remove certain public officials with the understanding that, with each new generation, the meaning of "misconduct" and "maladministration" will evolve. Cf. Griffin v. Pate , 884 N.W.2d 182, 186 (Iowa 2016) ("[T]he meanings of ... constitutional doctrines are not necessarily static, and [our analysis] instead considers current prevailing standards that draw their 'meaning from the evolving standards ... that mark the progress of a maturing society.' " (fourth alteration in original) (quoting Trop v. Dulles , 356 U.S. 86, 100-01, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) )).
Accordingly, our analysis must begin with an understanding that, as society matures, so do its standards for worthiness and capability in public office. We are obliged to not only look backward at the historical principles and precedent surrounding section 66.1A, but also to look forward and consider prevailing and evolving standards and expectations of public officials. Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Deremiah , 875 N.W.2d 728, 739 (Iowa 2016) ("From time to time we step back and consider whether our approach to sanctions in our cases is generally sufficient to advance the purposes of our ethics rules."). In this assessment, we are aided by our authority to observe legislative facts and use those facts to inform our ruling.[5] We ground our decision not in our own subjective principles, but in an objective review of prior and prevailing notions of misconduct and maladministration.
III. Removing Public Officials for Willful Misconduct or Maladministration in Office.
A. Legislative History of Iowa Code Section 66.1A. Before Iowa became the twenty-ninth state in the Union in 1846, the legislature promulgated territorial statutes. In 1843, the Revised Statutes of the Territory of Iowa implicitly recognized the ability to remove an elected official from office. See Revised Statutes of the Territory of Iowa ch. 160, § 8 (1843) ("That there shall be elected annually, in each and every organized county in this territory, at the general elections, one person to be inspector of weights and measures ...."); id. ch. 160, § 11 ("That whenever the inspector of weights and measures mentioned in this act, shall resign or be removed from office ...." (Emphasis added.)).
Following statehood, the first Iowa Code was published in 1851. Within Title IV, governing "elections, qualifications for office, contested elections, vacancies, etc.," Iowa Code Analysis (1851), the legislature included a provision governing the removal of certain elected officials from office. Iowa Code § 397 (1851). The legislature provided, "All county officers, including justices of the peace, may be charged, tried, and removed from office for official misdemeanors in the manner and for the causing [causes] following: ... For wilful mal-administration in office." Id. (first alteration in original). The legislature later extended the statute to "[a]ll county, township, city *851 and town officers, elected or appointed." Iowa Code § 1251 (1897). As well, the legislature announced that such officers may be removed for "wilful misconduct or maladministration in office." Id. § 1251(7).
In 1909, the legislature created a comprehensive removal framework for elected officials. 1909 Iowa Acts ch. 78 (codified at Iowa Code §§ 1258-c to 1258-k (Supp. 1913)). The Act specifically vested the courts with the authority to remove "[a]ny county attorney, sheriff, mayor, police officer, marshal or constable ... [f]or wilful misconduct or maladministration in office." Id. ch. 78, § 1. In 1924, the legislature again broadened the provision, giving the courts the authority to remove "[a]ny appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof ... [f]or wilful misconduct or maladministration in office." Iowa Code § 1091(2) (1924).
Since 1924, the provision has remained virtually unchanged, although it has been renumbered several times. Today, the provision is codified at section 66.1A and reads as follows:
Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:
1. For willful or habitual neglect or refusal to perform the duties of the office.
2. For willful misconduct or maladministration in office.
3. For corruption.
4. For extortion.
5. Upon conviction of a felony.
6. For intoxication, or upon conviction of being intoxicated.
7. Upon conviction of violating the provisions of chapter 68A.
Iowa Code § 66.1A (2015).
In sum, since Iowa's inception, our legislature has seen fit to supplement its election laws with corresponding measures to remove elected officials for certain types of misconduct. Contrary to the plurality's premise that the judiciary may not "impos[e] standards of conduct on elected officials," the legislature has always tasked the courts with removing officials whose conduct demonstrates their disqualification for office. Indeed, for the entirety of Iowa's history, our legislature has instructed that elected officials assume their offices subject to a number of qualifications, including the condition they refrain from willful misconduct and maladministration in office.
B. Precedent.
1. Standard for removal. Despite section 66.1A 's long history, we have scarcely been called to interpret its directives. The most comprehensive analysis of the statute and its purposes comes from three cases decided over a century ago in 1910. First, in State ex rel. v. Meek , citizens brought suit to remove the treasurer of Van Buren County, arguing he collected taxes for a number of days beyond the deadline without imposing the statutory late fees. 148 Iowa 671, 672, 127 N.W. 1023, 1024 (1910). When the treasurer at trial admitted he indeed collected such taxes, the court "excluded all evidence tending to show good faith and absence of evil motive." Id. On appeal, we considered "whether the acts thus freely admitted constitute 'willful misconduct in office' within the meaning of the statute." Id. at 673, 127 N.W. at 1024.
After surveying a number of foreign interpretations of "willful," both in the criminal and official misconduct contexts, we concluded "when willfulness is charged as *852 a ground for removing an officer from his office, his good faith and innocence of intentional wrong is a question upon which he is entitled to be heard in evidence." Id . at 679, 127 N.W. at 1026. Further, we explained "the primary purpose of the statute is the protection of public interests," and "those interests are not imperiled by acts of a trifling or unimportant character occasioning no injury." Id. at 680, 127 N.W. at 1026. Indeed, "[s]uch peril only arises when [the officer's] administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position." Id. "The very object of this statute is to rid the community of a corrupt, incapable, or unworthy official." Id. (quoting Welsh , 109 Iowa at 21, 79 N.W. at 370 ). The legislature did not intend to remove officers for "technical violations against which an ordinary civil action in damages affords a complete remedy." Id. at 682, 127 N.W. at 1027. Rather, "[t]he essential inquiry is whether the record shows the appellant conclusively and as a matter of law guilty of such willful misconduct in office that public interests require his removal." Id. at 684, 127 N.W. at 1027-28.
Second, in Henderson , we placed the removal statute in context with the legislature's authority to prescribe qualifications. 145 Iowa at 662-65, 124 N.W. at 769-70. In Henderson , the state sought to remove the mayor of the City of Marengo for intoxication. Id. at 658, 124 N.W. at 768. We explained, "[T]he act in question is not merely penal. The grounds of removal go to the question of qualification as such qualification shall be indicated by the specified acts of misconduct." Id. at 662, 124 N.W. at 769. We also explained that although the electors may have found the mayor "to be a man of strong personality and of many commendable qualities[,] ... the power of selection of the majority in such a case is not absolute. It is subject to the power of the Legislature to prescribe qualifications." Id. at 665, 124 N.W. at 770.
Finally, in State ex rel. Gebrink v. Hospers , we stressed the severity of removing an elected official from office. 147 Iowa 712, 714, 126 N.W. 818, 819 (1910). In Hospers , citizens brought suit to remove a county attorney after a grand jury declined to return an indictment against a corporation that had allegedly engaged in price discrimination. Id. at 713, 126 N.W. at 819. Although the citizens were frustrated by the lack of criminal consequences, we explained a prosecutor has
[a] certain degree of discretion in these respects ... and unless he abuses it or there is a clear showing of corruption, or negligence, or incompetence in the administration of his office, he is not amenable to proceedings for his removal.
Id. at 714, 126 N.W. at 819. Significantly, we explained removing an official "is a very drastic" remedy, as the effect is "not only to deprive an individual of an office to which he has been regularly chosen, but also to deprive the people of the services of the man whom they have selected for the position." Id. Invocation of the statute "should be exercised only in cases of official wrongdoing established by clear and satisfactory evidence." Id. However, we also held that the unsuccessful citizens should not be assessed the costs of the proceedings. Id. at 715, 126 N.W. at 819. In bringing the suit, the citizens "speak for the public and the law, and the courts take cognizance of their complaints not to remedy their private wrongs, but to conserve public interests." Id.
2. Instances of willful misconduct. Following the 1910 cases, we repeatedly affirmed that officers shall not be removed unless the alleged misconduct was committed willfully. See *853 State ex rel. Fletcher v. Naumann , 213 Iowa 418, 427, 239 N.W. 93, 97 (1931) ("[T]here was no showing that Naumann acted willfully, or that he did anything that would make it necessary ... to 'rid the community of a corrupt, incapable, and unworthy official[ ].' ") (quoting Meek , 148 Iowa at 680, 127 N.W. at 1026 ); State ex rel. Cash v. Canning , 206 Iowa 1349, 1353, 221 N.W. 923, 924-25 (1928) ("There can be no condonment of willful misconduct or corruption in office, even though the amount involved may appear to be inconsequential and trivial. Peculation, as a badge of misconduct and corruption, is not to be measured by its extent or grossness. There must, however, be a willful intent to do wrong or a maladministration of office to warrant a summary removal of a public officer."); State ex rel. Cochran v. Zeigler , 199 Iowa 392, 396, 202 N.W. 94, 95 (1925) ("The word 'willful,' as used in this connection ... impl[ies] knowledge on the part of the officer, together with a purpose to do wrong. ... Not every technical violation of a statute or of official duty will, however, justify the summary removal of the officer." (Citation omitted.)).
Yet, in State ex rel. Duckworth v. Smith , we explained the willfulness principles announced in Naumann , Canning , Zeigler , and Meek do not "require as an essential element of willfulness a greater scienter in the doing of an act than the character of the act permits." 219 Iowa 5, 7, 257 N.W. 181, 182 (1934). In Smith , a county treasurer took public funds for his private use more than twenty times, yet claimed the takings were not willful as contemplated by the removal statute. Id. at 6-7, 257 N.W. at 181-82. The treasurer believed the county owed him additional salary payments and some of the withdrawals occurred during periods when the treasurer believed he was owed payments. Id. at 8, 257 N.W. at 182. We held it to be "beside the point" that "the county may have owed him salary ... for the salary of the treasurer must be paid on warrants drawn by the county auditor. The treasurer cannot help himself to public funds even in the payment of his salary." Id. Indeed, "[w]e [were] at a loss to discover any worthy motive which could have prompted him to take public money for his private use." Id. at 7, 257 N.W. at 182. After looking at "[t]he whole picture," we determined the county treasurer's conduct "present[ed] a case in which 'willfulness' must be found to be present." Id. at 7-8, 257 N.W. at 182.
In 1974, we concluded removal was justified for three county supervisors. State v. Bartz , 224 N.W.2d 632, 639 (Iowa 1974). In Bartz , the supervisors (1) accepted gifts and other perks from persons who regularly contracted with the county, (2) maintained loosely managed slush funds instead of depositing all funds with the county treasurer, and (3) submitted mileage claims in significant excess of what was actually driven. Id. at 635, 638-39. We explained the State must provide "clear, satisfactory and convincing" evidence that the supervisors committed misconduct "willfully and with an evil purpose." Id. at 638. Although the trial court concluded the supervisors acted "without evil or corrupt motives ... we reach[ed] an opposite conclusion." Id. Our de novo review revealed evidence that proved the supervisors' conduct "fell well below the standards of conduct expected of public officials." Id.
Finally, in 1978, we removed a sheriff from office for willful misconduct and maladministration in office. Callaway , 268 N.W.2d at 849. In Callaway , the state petitioned to remove the Hardin County Sheriff based on five incidents in which he brutalized or otherwise used excessive force against inmates and citizens. Id. at 842-46. The sheriff admitted to making a "mistake" in two such incidents, but "defend[ed] his use of force in the other incidents."
*854 Id. at 847. Thus, the sheriff subjectively believed his force was necessary and not contrary to his duties. We found the sheriff's justification defense "depend[ed] in part upon his credibility," but "also depend[ed] on distorting the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner." Id. We not only found the state's witnesses to be more credible, but also determined the sheriff "plainly breached" officer force standards "in the five principle incidents relied on by the State." Id. Furthermore, we found the sheriff's subjective intent "distort[ed] the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner." Id. at 847. We explained,
This is not a case of a momentary lapse or of a few mistakes in judgment in routine matters. It is a case of repeated, deliberate brutality to prisoners. The conduct shown here is antithetical to the professionalism which the public requires and generally receives from law enforcement officers. In fact, it contradicts the standards which peace officers have established for themselves.
Id. at 848. Thus, because "[t]he authorities uniformly agree[d] that such misconduct by a law enforcement officer is a ground for ouster from office," the state met its burden in proving the sheriff "was guilty of willful misconduct in office." Id. at 847-48.
Against this backdrop of legislative intent and precedent, we proceed to consider the nature of sexual harassment and whether it falls within the types of misconduct contemplated by section 66.1A.
IV. Sexual Harassment.
"Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (alteration in original). When Congress enacted Title VII of the Civil Rights Act of 1964, it intended "to strike at the entire spectrum of disparate treatment of men and women." Id. (quoting City of L.A. Dep't of Water & Power v. Manhart , 435 U.S. 702, 707 n.13, 98 S.Ct. 1370, 1375 n.13, 55 L.Ed.2d 657 (1978) ). Sex discrimination has always encompassed more than a threat of economic loss or other tangible adverse employment action. Title VII-and the Iowa Civil Rights Act (ICRA)-"afford[ ] employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Id. at 65, 106 S.Ct. at 2405.
" 'A hostile work environment is a cumulative phenomenon,' and a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n , 895 N.W.2d 446, 470 (Iowa 2017) (quoting Alvarez v. Des Moines Bolt Supply, Inc. , 626 F.3d 410, 421 (8th Cir. 2010) ). Although "[a] few isolated or sporadic [comments] over a long period of time," do not rise to the level of actionable discrimination, "repeated harassing remarks may be sufficient to establish hostile working environment." Id.
The effects of hostile-work-environment discrimination are known and severe. Women who are sexually harassed "feel humiliated, degraded, ashamed, embarrassed, and cheap, as well as angry." Catharine A. MacKinnon, Sexual Harassment of Working Women 47 (1979) [hereinafter MacKinnon]. Women do not "want to be sexually harassed at work. Nor do they, as a rule, find it flattering." Id. "Women's confidence in their job performance is often totally shattered," and "[t]hey are left *855 wondering if the praise they received prior to the sexual incident was conditioned by the man's perception of the sexual potential in the relationship." Id. at 51. Importantly, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." Harris v. Forklift Sys., Inc. , 510 U.S. 17, 22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Harassment need not "seriously affect employees' psychological well-being" in order to "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." Id. at 22, 114 S.Ct. at 371.
Over time, employers have gleaned that it is no longer permissible to enunciate blatant prejudices in the workplace. However, "these feelings remain under the surface, often taking the form of humor." MacKinnon, at 52 (quoting Eleanor L. Zuckerman, Masculinity and the Changing Woman , in E. L. Zuckerman, ed., Women and Men: Roles, Attitudes and Power Relationships 65 (1975)). "Humor ... has been a major form of" sexual harassment's trivialization, and is "a major means through which its invisibility has been enforced." Id. Indeed, framing derogatory and discriminatory comments as "jokes" permits courts to characterize the misconduct as merely "crude," rather than discriminatory. Men are just joking, and women should lighten up.
Sexual harassment of an employee and, therefore, discrimination against an employee on the basis of sex, is no mere "technical violation[ ]." Meek , 148 Iowa at 682, 127 N.W. at 1027. Consistent state and congressional efforts to eradicate and punish sexual harassment establish society's firm disavowal of this type of misconduct in the workplace. In 1991, Congress amended Title VII to allow successful sexual harassment plaintiffs to recover punitive damages. Civil Rights Act of 1991, Pub. L. No. 102-166, § 1, 105 Stat. 1071, 1071 (1991) (finding "additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace"). In 1992, two years after this court recognized a sexual harassment cause of action under the Iowa Civil Rights Act, see Lynch v. City of Des Moines , 454 N.W.2d 827, 833 (Iowa 1990), the Iowa legislature specifically acted to prohibit the sexual harassment of state employees. See 1992 Iowa Acts ch. 1086, § 2 (codified at Iowa Code § 2.11 (1993) ) (commanding each house of the general assembly to implement sexual harassment training and grievance procedures); id. § 3 (codified at Iowa Code § 19B.12 ) (expressly barring state employees from engaging in quid pro quo and hostile-work-environment harassment).
Today, lawmakers continue to emphasize that sexual misconduct has no place in government offices. In October and November of 2017, both the United States House of Representatives and Senate introduced measures to combat sexual harassment in government offices. Congressional Sexual Harassment Training Act, H.R. 4155, 115th Congress (2017); STOP Sexual Harassment Resolution, S. Res. 323, 115th Congress (2017). Across the country, state legislatures have continued to adopt resolutions and enact policies that target and punish harassment in public offices.[6] In the private sector, professional *856 associations across all disciplines have proffered "zero tolerance" policies aimed at eradicating sexual harassment in their respective fields.[7]
Employment discrimination statutes and private sexual harassment policies represent a collective decision that all persons, regardless of age, gender, race, religion, disability, etc., deserve to live dignified, autonomous lives. Title VII and the ICRA are not workplace codes of conduct or matters of "public opinion"-they are necessary vehicles for social and economic mobility. When women are subjected to hostile work environments, they are invariably forced to make a decision between unemployment and intolerable working conditions. When women must move from one job to the next, seeking a workplace ambiance free from discriminatory insult, they are prevented from saving for retirement or their children's college educations. They have inconsistent access to healthcare for themselves and their families. When women must continually start anew with new companies, they are prevented from moving up the ranks and attaining positions of authority. Beyond the dignitary harms suffered, when sexual harassment is allowed to endure, women must *857 work harder to stay afloat while men grow and advance in status.
Sexual harassment was once a putative consequence of working while female. However, legislative enactments, private measures, and public discourse conclusively demonstrate that society has evolved. Sexual misconduct in the workplace, especially in a government workplace, is no longer tolerated. County employees, like all other employees, have a statutory and constitutional right to be free from discrimination. It is in the image of this clear, ubiquitous public interest that we ground our understanding of misconduct and maladministration in office. Yet, in the end, it is left to the courts to recognize sexual harassment and apply the law to remove it in all aspects of life.
V. Application.
A. Misconduct. The unvarnished record reveals the depth of the abhorrent conduct at the center of this case. This conduct occurred in the presence of those who worked in the office of a public official and those who entered the office for business.
At trial, five people testified to observing Watkins in the office in his underwear on different occasions. These people not only included Jasmin Wallingford, the office legal assistant, but also two women who cleaned the office and a client and his wife who had stopped into the office one morning to pick up documents. The two women who cleaned the office were Amish and had once confronted Watkins about being uncomfortable with seeing him in his underwear in the office.
Wallingford, who was twenty-years-old, was the target of most of the conduct at issue. Watkins once showed Wallingford a video he had recorded of his wife squirting breastmilk in Wallingford's car. On another occasion, he showed Wallingford a photograph of his wife's vagina, as well as a photograph of his wife naked from the waist down. Watkins also kept naked photographs of his wife on his desk computer and would look at them during office hours. Virginia Barchman, the assistant county attorney, entered his office on one occasion to speak with him and observed one of the photographs on his computer screen.
Watkins inquired into Wallingford's doctor appointments and asked her on three or four occasions if "her vagina was still broke." Watkins told Wallingford, during work, that her "boobs [were] distracting him" and that she "should wear that shirt out" if she "ever went clubbing." Watkins complained to Wallingford that his wife never wanted to have sex and that he "just wished that he had a wife that had sex with him all the time." Watkins informed Wallingford that he kept naked pictures of former girlfriends on his phone and enjoyed looking at them. Watkins made a sexually driven reference about a floor cleaner called "Bona" in the presence of Wallingford and the young Amish women who cleaned the office.
Watkins also used sexually graphic and demeaning rhetoric in the workplace when discussing other women. On one occasion, after Watkins made an inappropriate comment at a birthday party, he told Wallingford the following Monday during work that he needed to see if this courthouse employee "wore a padded bra or if her boobs were really that big." On another occasion, Watkins announced that a local female attorney with initials "T.Q." should be referred to as "T. Queef," which refers to a term that describes the emission of air from the vagina.
Just as all of this evidence was necessarily filtered through the lens of those who witnessed it, it again becomes filtered through the lens of those who judge it. For *858 the plurality, its perspective is not so much affected by what it saw in the evidence, as by what it saw as absent from the evidence. It saw crudities, but it also saw a workplace environment in which Wallingford's job was not conditioned on fulfilling Watkins's sexual gratification. It saw the vulgarities in Watkins's conduct, but it also saw an absence of quid pro quo sexual harassment. It saw vulgarities, but looked and could not find an employer who misused "his office or his position of power or authority to obtain anything from Wallingford." Furthermore, it saw the workplace rhetoric by Watkins as "insensitive," but rhetoric that "did not concern Wallingford herself." It saw Watkins as "insensitive," but saw Wallingford as having more reasons for disliking her workplace environment than just the rhetoric and conduct engaged in by Watkins.
The filter used by the plurality narrows the definition of sexual harassment, and in turn, misconduct, and fails to understand sexual harassment from the perspective of the victim. What the plurality does not see through its lens is that the misuse of a position of power or authority does not require quid pro quo conduct. Power and authority are equally exploited when they are used to create a workplace environment riddled with discriminatory insults. What, if not power, could embolden an employer to entirely disregard fundamental boundaries and discriminate on the basis of sex with no consideration for the consequences?
Sexual harassment in the workplace will not be eliminated until it is first understood for what it is. It is not so much "an issue of right and wrong [as] an issue of power." MacKinnon, at 173. The fundamental problem is not the content of workplace conversation, but how sexually explicit rhetoric is used in the workplace by those in power at the expense of others. Id. An employer who "[seeks] to misuse his office or his position of power or authority to obtain" something from an employee certainly harms the employee, but an employee is equally aggrieved by a workplace dominated by derogatory slights.
Likewise, a lens that sees sexual comments or "jokes" not specifically directed at the employee herself as "insensitive" but tolerable trivializes the lived experiences of those who have been forced to withstand them. Indeed, a finding that Watkins's comments "did not concern Wallingford herself" rests on a defunct and antiquated view of hostile work environments. Watkins was speaking about women. He was commenting on the bodies of women. He was objectifying and sexualizing women. Wallingford was required to endure a slew of degradations directed solely at women-a class of which she is a member.
Lastly, Wallingford may well have had other reasons for disliking her work environment on top of Watkins's harassment, but those reasons do not negate the severity of Watkins's behavior. Employees need not refrain from complaining about other frustrating behaviors in order for a court to take a sexual harassment complaint seriously.
In the end, Watkins's misconduct amounted to a hostile work environment when viewed through a lens that sees the complete picture. He consistently, over the course of months, made unwelcome and sexually charged comments to Wallingford and in her presence and engaged in misconduct in office.
B. Willful. The state of mind or willfulness behind conduct can be difficult to see. As with defining misconduct, it often depends on a measured view of all the facts and circumstances surrounding the conduct. See *859 Nelson v. James H. Knight DDS, P.C. , 834 N.W.2d 64, 79-80 (Iowa 2013) (Cady, C.J., concurring specially) (finding the specific, personal relationship between an employer and employee animated an adverse employment action, rather than actionable discrimination).
At the outset, no evidence exists in the record to support Watkins's belief that his rhetoric and conduct were welcome or appropriate in the workplace. Wallingford never commented on Watkins's anatomy or made unsolicited, sexually charged comments. Although Watkins characterizes his law office as one of joking and familiarity, Wallingford's contribution to that atmosphere was vastly different and consisted of such conduct as wearing a funny wig on April Fools' Day and once taping an air horn to Watkins's chair. Accordingly, any view that Watkins's comments were part of an established atmosphere has no support in the record. Likewise, the complete and utter one-sidedness of the degrading rhetoric erodes any inference that Watkins's harassment was not willful.
Overall, the plurality relies on various common responses to claims of sexual harassment in the workplace to support its finding that the conduct and rhetoric of Watkins was not willful. It observed that Watkins's conduct did not constitute a crime. It could not find any caselaw that found willful misconduct under similar facts. It saw the conduct engaged in by Watkins to be his personality and not directed at the attributes of Wallingford as a person. It saw a workplace that allowed Watkins to feel comfortable to engage in such conduct and a workplace in which Wallingford felt comfortable to engage in nonsexual humor from time to time.
The lens used to reach the plurality's decision did not observe or factor in the powerful dynamics of employer authority and control over a subordinate in the workplace. It did not see that Wallingford hoped to be a lawyer or her hope that a position in a law office and a positive association with a county attorney would help advance her goal of attending law school. It did not see how Watkins's clout informed Wallingford's desire to maintain a friendship with Watkins and his wife, as a poor relationship could have lasting consequences for her professional career in a county with just over 7000 people. It did not see how the dynamics of subordinates can minimize employer misconduct and perpetuate sexual harassment in the workplace.
Watkins concedes he did not misspeak, nor was he naïve to the sexual connotations of his comments. Indeed, testimony demonstrates he was aware of the inappropriate nature of his comments to employees. Watkins's former child-care worker, Tayt Waibel, testified she once had missed a phone call from Watkins while she was in the shower. She returned his call and explained why she did not answer. In response, Watkins told Waibel she should have FaceTimed him while she was in the shower. Watkins then stated, "[T]his is probably why I'm in trouble for sexual harassment."
In Callaway , we found the sheriff's view that his force was justified "depend[ed] in part upon his credibility," but "also depend[ed] on distorting the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner." 268 N.W.2d at 847. Here, Watkins's position similarly depends in part on his credibility. Watkins's admission to Waibel undermines his testimony that his behavior was innocent and reasonable.
Moreover, in Callaway , we looked to several sources governing an officer[']s duty to refrain from excessive force. Id. at 847-48. We noted the common law standard found in a prominent legal encyclopedia, see 6A C.J.S. Arrest § 49, the statutory *860 standard, see Iowa Code § 755.2 (1975), and the Law Enforcement Code of Ethics, see Louis B. Schwartz & Stephen R. Goldstein, Law Enforcement Handbook for Police 48 (1970). Callaway , 268 N.W.2d at 847-48. We charged the sheriff with knowledge of these standards and determined his consistent deviation from them amounted to a willful abdication of his duties as a law enforcement officer. Id. Here, Watkins is charged with being aware of the standards governing his conduct as a public official and employer. The rules of professional conduct expressly prohibit attorneys from engaging in sexual harassment. Iowa R. Prof'l Conduct 32:8.4(g). The ICRA and Title VII prevent all employers, including state employers, from engaging in hostile work environment harassment. Iowa Code § 216.6(1)(a ) (2015); 42 U.S.C. § 2000e-2(a)(1) (2012). As in Callaway , Watkins is charged with knowledge of these standards, and his consistent deviation from them is evidence of a willful abdication of his duties as an officer and employer.
Watkins repeatedly, and knowingly, made sexually charged comments to his employees and created a hostile work environment. Despite Watkins's consistent and intentional deviation from the governing standards, the plurality nevertheless concludes he did not act with an "evil purpose" when harassing Wallingford.
What benign intent is consistent with harassment? The plurality requires a "greater scienter in the doing of an act than the character of the act permits." Smith , 219 Iowa at 7, 257 N.W. at 182. Harassment, by its nature, is not done benevolently or innocuously. It requires more than an occasional aberration or momentary lapse in judgment. Harassment exists when an employer repeatedly, over the course of time, acts with such disregard that it alters the conditions of employment.
When Watkins told Wallingford that her breasts were distracting him, the plurality saw an innocent intention. When Watkins repeatedly entered the workplace in his underwear, when his bedroom and a restroom were located upstairs, the plurality saw an "unstructured environment." When Watkins told Wallingford, during work hours, that he wondered whether the courthouse clerk's breasts "were really that big," the plurality saw a plausible blunder. When the character of Watkins's misconduct over the entire term of Wallingford's employment "presents a case in which 'willfulness' must be found to be present," the plurality ultimately found no knowledge of wrongdoing. Smith , 219 Iowa at 7-8, 257 N.W. at 182.
It is, of course, not always easy to step outside of oneself and see bias when none was intended or see injustice when the opposite was envisioned. But such is the nature of an evolving society in which standards of conduct once decreed as "natural and reasonable" are now understood to be insidious and arbitrary. Carragher , 149 Iowa at 229, 128 N.W. at 354. There are times when such a failure of perspective may be viewed with generosity in hindsight, but today's opinion is not such an instance.
The recognition and prohibition of sexual harassment is far from a recent revelation. It has long been understood that making unsolicited comments about the breasts of an employee is illegal and degrading and that showing a photograph of your naked wife and of her vagina to an employee is unlawful and demeaning. Today's decision is intimately tied to a bygone era of law that shielded men who knew better, at the expense of their female employees, who were required to abandon *861 their jobs or forced to accept harassment as a condition of employment.
While the plurality sees itself as upholding the integrity of elections, such a view weakens the checks and balances of government. The very purpose of the removal statute is to undo an election. Moreover, the opinion reveals the enduring vestiges of de jure discrimination. We were able to see with clarity in 1978 that no sheriff could possibly believe that brutalizing a prisoner is permissible, yet still cannot see with clarity today that no employer could possibly believe that creating a workplace atmosphere defined by degrading women is permissible. One view is not less serious than the other. Both are but different forms of willful misconduct. It is time for but one view to exist. The prolonged period of societal disinterest in the plight of working women must no longer obscure how inappropriate comments about one woman unquestionably concerns all women in the workplace.
Watkins's conduct was more than "inappropriate" and "disrespectful"-it was discriminatory. He deliberately subjected Wallingford to a barrage of indignities directed solely at women. An officer who intentionally discriminates on the basis of sex commits grave misconduct in office and is removable under section 661.A.
Hecht, J., joins this dissent.

"Legislative facts are 'those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take.' " State v. Henze , 356 N.W.2d 538, 540 n.1 (Iowa 1984) (en banc) (quoting Kenneth Culp Davis, Judicial Notice , 55 Colum. L. Rev. 945, 952 (1955) ). "[L]egislative facts are not concerned with particular problems of individuals, but involve a determination of what is in the best interests of the public generally." McMurray v. City Council , 642 N.W.2d 273, 277 (Iowa 2002).

See, e.g. , S.R. 51, Reg. Sess. 2018 (Ala. 2018) (adopting a legislative policy on sexual harassment); H.R. 18-1005, Seventy-first Gen. Assemb., 2d Reg. Sess. (Colo. 2018) (expelling a state representative for violating legislative sexual harassment policy); H.R. 21, 149th Gen. Assemb. (Del. 2018) (adopting a legislative policy on sexual harassment); H.B. 973, 2017-2018 Reg. Sess. (Ga. 2018) (extending legislative sexual harassment policy to registered lobbyists); H.R. 687, 100th Gen. Assemb. (Ill. 2017) (creating a sexual harassment task force); H.B. 1309, 120th Gen. Assemb., 2d Reg. Sess. (Ind. 2018) (requiring annual sexual harassment training for members of the general assembly); H.B. 524, 2018 Reg. Sess. (La. 2018) (enacting sexual harassment policy for all public officers and employees); H. 3983, 190th Gen. Ct. (Mass. 2017) (ordering comprehensive review of all House of Representatives sexual harassment policies); S. 2262, 190th Gen. Ct. (Mass. 2017) (ordering comprehensive review of all Senate sexual harassment policies); H.R. 7678, 2018 Gen. Assemb. (R.I. 2018) (creating a special legislative commission to study sexual harassment); H.R. 5, 2017-2018 Leg. Sess. (Vt. 2017) (establishing a sexual harassment prevention panel to review complaints against members of the House); H.B. 371, 2018 Reg. Sess. (Va. 2018) (requiring all legislative branch employees to complete sexual harassment training every two years); H.B. 2759, 65th Leg., 2018 Reg. Sess. (Wash. 2018) (establishing the Washington state women's commission and ordering the review of sexual harassment policies).

See, e.g. , ACS Governing Documents, at 51 (Am. Chem. Soc'y 2018) ("Harassment of any kind, including but not limited to unwelcome sexual advances, requests for sexual favors, and other verbal or physical harassment will not be tolerated."); Appendix 3.2: Policy on Prof'l Conduct & Prohibition Against Harassment (Am. Dental Ass'n) ("The ADA absolutely prohibits sexual harassment ...."); Code of Prof'l Conduct r. 1.400.010 (Am. Inst. of Certified Pub. Accountants 2016) ("A member would be presumed to have committed an act discreditable to the profession ... if a final determination ... is made by a court ... that a member has violated any antidiscrimination laws ... including those related to sexual and other forms of harassment."); Am. Med. Ass'n Code of Med. Ethics Op. 9.1.3 ("Sexual harassment in the practice of medicine is unethical. ... Physicians should promote and adhere to strict sexual harassment policies in medical workplaces."); ANA Position Statement: Sexual Harassment (Am. Nurses Ass'n 1993) ("ANA believes that nurses and students of nursing have a right to and responsibility for a workplace free of sexual harassment."); Code of Ethics Canon 8 (Am. Soc'y of Civil Eng'rs 2017) ("Engineers shall not engage in discrimination or harassment in connection with their professional activities."); Code of Ethics Statement (Event Serv. Prof'ls Assoc.) ("We will not engage in or condone any form of harassment or discrimination."); IEEE Polices § 9.26 (Inst. of Elec. & Elecs. Eng'rs 2018) (prohibiting "[d]iscrimination, [h]arassment and [b]ullying against any person for any reason, for example, because of ... gender"); Model Rules of Prof'l Conduct r. 8.4(g) (Am. Bar Ass'n 2016) ("It is professional misconduct for a lawyer to ... engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of ... sex ...."); Code of Conduct & Sexual Harassment Policy (Nat'l Ass'n of Realtors) ("The National Association fully supports the rights and opportunities of all its ... members and employees to work in an environment free from discrimination and without subjugation to sexual harassment.").